85 F.3d 1258
 152 L.R.R.M. (BNA) 2449, 64 USLW 2786,
132 Lab.Cas. P 11,598
 E & L TRANSPORT COMPANY, Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
and
Local Union 710, Highway Drivers, Dockmen, Spotters,
Rampmen, Meat Packing House and Allied Products
Drivers and Helpers, Office Workers and
Miscellaneous Employees,
Intervenor-Respondent.
 Nos. 94-3490, 94-3685.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 26, 1995.
Decided June 5, 1996.
 
 R. Ian Hunter (argued), Patricia M. Morrow, Troy, MI, for E & L Transport Co.
 Julie B. Broido (argued), N.L.R.B., Washington, DC, Scott A. Gore, Elizabeth Kinney, N.L.R.B., Chicago, IL, Aileen A. Armstrong, Linda J. Dreeben, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, for N.L.R.B.
 Marvin Gittler, Susan Brannigan, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, IL, for intervenor-respondent.
 Before BAUER, MANION, and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 The National Labor Relations Board found that E & L Transport Company violated the National Labor Relations Act by threatening not to hire the union-affiliated ex-employees of a former competitor and by discriminating against those applicants by either refusing to consider or refusing to hire them for various positions. E & L challenges the Board's order and requests that we deny enforcement; the general counsel asks us to grant enforcement. We deny enforcement in part and grant enforcement in part and remand the remainder of the case to the Board for further proceedings.
 
 
 2
 * Petitioner E & L Transport Company is a motor carrier engaged in the interstate transportation of newly manufactured automobiles. It operates several terminals, including one in Chicago. In February 1990, E & L was awarded the contract to be the sole carrier in Chicago for the Ford Motor Company. Previously, E & L had been the secondary carrier for Ford; Nu-Car Carriers had been the primary carrier. As a result of the 1990 contract, Nu-Car phased out and eventually closed its Chicago operations, and E & L assumed all of Ford's Chicago business by the middle of April 1990.
 
 
 3
 Local 710 of the Highway Drivers, Dockmen, Spotters, Rampmen, Meat Packing House and Allied Products Drivers and Helpers, Office Workers and Miscellaneous Employees Union ("union") represents E & L and Nu-Car employees. Pursuant to the National Master Automobile Transport Agreement--the collective bargaining agreement between the union, E & L, and Nu-Car--when Nu-Car closed its doors E & L was obligated to offer employment to the former Nu-Car drivers. The agreement did not obligate E & L to employ the former Nu-Car garage workers or the former Nu-Car office employees.
 
 
 4
 On March 29, 1990, Eugene Wade, the union representative, and Bob Brown, the union steward at Nu-Car and soon-to-be E & L driver,[1] met with Al Schaeffer, E & L's terminal manager, to discuss E & L's potential employment of the former Nu-Car union employees. Schaeffer told them that E & L would hire the garage workers. Schaeffer explained that E & L did not currently need the office clericals because the office was fully automated. Schaeffer mentioned that E & L would consider hiring the office employees at some later point but that "we will not hire the Union office people." On two other occasions, Schaeffer stated that E & L's Chicago office "would be a non-union office. There would not be any union employees." On one occasion, Lisa Buschman, E & L's sole check-in dispatch supervisor at the time, overheard Schaeffer making the statement to another member of management. On the other occasion, Schaeffer made the statement directly to James Houseman, E & L's operations supervisor, at the same time Schaeffer instructed Houseman to determine which of the former Nu-Car office employees were nonunion and to discretely obtain their resumes.
 
 
 5
 By the end of March 1990, six of the former Nu-Car office employees had submitted their resumes to E & L for consideration relative to available office positions. They included two nonunion employees, Nancy Norton, Nu-Car's office manager, and Pat Garcia, the personal secretary to Nu-Car's terminal manager, and four union members who were Nu-Car's general office employees, Rebecca Pyka, Kathy Williams, Kathy Parker, and Dawn Sczcepaniak. All six ceased working for Nu-Car by March 30, 1990.
 
 
 6
 In late March 1990, E & L interviewed the two nonunion Nu-Car office employees, Norton and Garcia, for the position of confidential secretary. E & L did not interview Pyka, Williams, Parker, or Sczcepaniak, all of whose resumes were on file. Both Garcia and Norton were asked during their interviews why they were not members of the union. E & L hired Norton for the job on March 31, 1990, but she was terminated on April 5, 1990, for unsatisfactory job performance. Her termination coincided with the removal of Al Schaeffer as E & L's terminal manager and the hiring of his replacement, Ron O'Reilly. Instead of interviewing to permanently fill the then-vacant confidential secretary position, on April 6, E & L sought a temporary replacement through Kelly Temporary Services. The temporary secretary, Judy Nilsen, was offered the job of confidential secretary on a permanent basis on April 19, 1990.
 
 
 7
 In addition to requesting one temporary secretary, the April 6 order to Kelly Temporary Services also requested one temporary data-entry clerk. E & L made seven subsequent orders to Kelly Temporary Services for secretaries, data-entry clerks, and typists. Several of those orders involved replacing individuals E & L had found unsatisfactory. The total number of temporary secretaries, data entry clerks, and typists utilized by E & L at any one time ranged from two to four.[2] E & L ceased utilizing Kelly temporaries in September 1990.
 
 
 8
 In May 1990, E & L placed an advertisement in a local newspaper seeking "dispatch supervisors." Shortly thereafter, O'Reilly spoke with Wade and Brown, and Wade again asked if E & L would hire the former office employees. O'Reilly responded that the former office workers would be considered if they put in resumes but that if E & L hired them "they will not be Union." O'Reilly had made an identical statement to Wade and Brown during another discussion in late April 1990.
 
 
 9
 In June 1990, E & L interviewed applicants for the two check-in dispatch supervisor positions. The interviewees included Williams and Sczcepaniak, both former Nu-Car office employees and union members. Parker and Pyka applied, but E & L did not interview them. In July 1990, E & L offered the positions to Williams and Vern Joyner, who had responded to the newspaper advertisement.
 
 
 10
 On April 27, 1990, the union filed an unfair labor practices charge against E & L with the Regional Director of Region 13 of the NLRB, alleging that E & L had violated sections 8(a)(1), (3), and (5) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(1), (3), (5), by refusing to consider the four former Nu-Car office employees for various positions because of their union membership and activities. The Regional Director issued a complaint on June 29, 1990, charging E & L with unfair labor practices in violation of §§ 158(a)(1) and (3). Specifically, the complaint alleged that (1) Schaeffer's statement that E & L would not hire the union members constituted a threat, (2) O'Reilly's statement that if E & L hired the union members they would be nonunion constituted a threat, (3) E & L discriminated against the four union members on the basis of their union membership or activities when it failed to consider them for the confidential secretary position, and (4) E & L discriminated against the four union members when it failed to consider them for one temporary clerical position. The Regional Director issued an amended complaint on December 7, 1990, alleging, in addition to the claims in the original complaint, that E & L discriminated against the union members when it refused to consider two and refused to hire one for one check-in dispatch supervisor position. On April 2, 1991, the Regional Director submitted her notice of intent to amend the amended complaint to include the allegation that E & L refused to consider the four union members for more than one temporary clerical position.
 
 
 11
 The administrative law judge held a hearing on the alleged unfair labor practices on April 8-10 and June 11-12, 1991. The ALJ issued his decision and order on December 16, 1992. He found that Schaeffer's statement to Brown that E & L would not hire the union former office workers constituted a threat in violation of § 158(a)(1). The ALJ also found that O'Reilly's statement to Brown that if E & L hired the former union office workers they would be nonunion was a threat in violation of § 158(a)(1). He further found that the check-in dispatch supervisor position did not qualify as a supervisory position within the meaning of 29 U.S.C. § 152(11) and that E & L had discriminated against three of the union members because of their union activities when E & L did not consider two and did not hire one for that position.
 
 
 12
 The ALJ determined that a company may not discriminate against nonemployee applicants for a confidential position on the basis of their prior union status or activities, and he found that E & L had done just that by not interviewing the four union members for the confidential secretary position.
 
 
 13
 Finally, the ALJ found that E & L had discriminated against the four union members by not considering them for the temporary clerical positions. The ALJ ordered E & L to offer positions to the three union members who were not hired and to make all four whole for any lost earnings that resulted from the discrimination. E & L filed exceptions to the ALJ's decision and order.
 
 
 14
 A panel of the NLRB ("Board") issued its decision and order on October 18, 1994. E & L Transport Co., 315 N.L.R.B. 303, 1994 WL 574148 (1994). The Board summarily affirmed the ALJ's decision, except for two issues with regard to which it applied its own reasoning and affirmed. The first issue concerned the supervisory status of the check-in dispatch supervisor position; the Board concluded that the position was nonsupervisory because although Joyner was required to issue warnings to drivers, the warnings he issued were insufficient to afford him supervisory status: "[T]o the extent that Joyner has occasionally issued warnings which are not automatic pursuant to regulations or the contract, such incidents have been isolated and sporadic and are insufficient to indicate that Joyner is a supervisor within the meaning of Sec. 2(11)." The second issue concerned the confidential secretary position; the Board observed that the ALJ had not actually determined whether the position met the "labor nexus" test.[3] Assuming that it did, the Board decided that applicants for that position are still within the definition of "employee" and, as a result, are accorded the antidiscrimination protections of the Act pursuant to Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 182-87, 61 S.Ct. 845, 847-49, 85 L.Ed. 1271 (1941). The Board did not decide what protections actual confidential employees are accorded under the Act. The Board did articulate a defense, which E & L could not meet, for employers charged with discriminating against applicants for confidential labor nexus positions:
 
 
 15
 [A]n employer would have to show more than mere membership in a union or past union activities in order to disqualify an applicant for being considered for a confidential position; rather, the employer would have to prove by objective evidence that it has reasonable grounds for believing that an applicant will be disloyal or will impair business operations.
 
 
 16
 On October 25, 1994, E & L filed a petition to review and set aside the Board's decision and order. On November 18, 1994, the general counsel, on behalf of the NLRB, filed a cross-application for enforcement. We ordered the cases consolidated.
 
 II
 
 17
 E & L raises multiple challenges to the Board's finding that it unlawfully discriminated against the union applicants. We first consider E & L's arguments that the confidential secretary and check-in dispatch supervisor positions are not covered by the antidiscrimination provisions of the Act. We then consider E & L's challenges to the discrimination finding itself, as well as E & L's challenges to the finding that it made unlawful threatening communications. Finally, we consider E & L's argument that the general counsel should not have been permitted to amend the amended complaint.
 
 
 18
 * E & L argues that applicants for confidential positions with a labor nexus should be accorded none of the protections of the Act, including the protection against discrimination under § 158(a)(3). In support of that conclusion, E & L relies upon Peerless of America, Inc. v. NLRB, 484 F.2d 1108, 1112 (7th Cir.1973), and NLRB v. Wheeling Electric Co., 444 F.2d 783, 788 (4th Cir.1971), which held that actual confidential employees are treated as supervisory employees completely excluded from protection under the Act.[4] If actual confidential employees are treated as supervisory, E & L argues, then the Board's holding in Pacific American Shipowners Ass'n, 98 N.L.R.B. 582, 596 (1952), that nonemployee applicants for supervisory positions are not protected would dictate that nonemployee applicants for confidential positions are also not protected. Thus, under E & L's theory, nonemployee applicants for confidential positions receive none of the protections accorded by the Act.
 
 
 19
 The general counsel argues that this is not an appropriate case in which to consider what protections accrue to actual confidential employees. Instead of following E & L's indirect analysis, the general counsel urges that we should directly address the protections due applicants. According to the general counsel, the Board's decision to protect applicants and accord only a limited defense to a charge of discrimination is a rational construction of the Act because to do otherwise would deter individuals from joining unions for fear of forever limiting their employment options.
 
 
 20
 The extent to which applicants for confidential positions with a labor nexus are protected by the Act is a question of law. So too is the Board's determination as to what qualifies as a defense against an unfair labor practice charge. In reviewing the Board's interpretation of the Act, we are mindful of the fact that "Congress conferred the authority to develop and apply fundamental national labor policy" on the Board. Beth Israel Hosp. v. NLRB, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978). For that reason, where the Act is silent or ambiguous on an issue, we will uphold the Board's conclusion regarding that issue if it is "rational and consistent with the Act." NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 787, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990). However, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).
 
 
 21
 As an initial matter, we find that the statute is ambiguous as to whether applicants for confidential positions with a labor nexus are protected under the Act. Indeed, the Act does not even mention applicants for employment. See 29 U.S.C. § 152(3).
 
 
 22
 The Act is similarly ambiguous with regard to what protections accrue to actual confidential employees. A main purpose of the 1947 amendments to the Act was to exclude supervisors from the definition of "employee" under the Act, thereby excluding them from the protections of the Act. Wheeling Electric, 444 F.2d at 785. The original House version of the bill specifically included confidential employees within the definition of "supervisor." H.R. 3020, 80th Cong., 1st Sess. § 2(3) (1947). However, the Senate version, which was the one eventually passed, did not specifically mention confidential employees as being within the definition of "supervisor." S. 1126, 80th Cong., 1st Sess. § 2(3) (1947). The report of the conference committee provided an explanation for the absence of confidential employees from the final bill:
 
 
 23
 The conference agreement, in the definition of "supervisor," limits such term to those individuals treated as supervisors under the Senate amendment. In the case of persons working in labor relations, personnel and employment departments, it was not thought necessary to make specific provision, as was done in the House bill, since the Board has treated, and presumably will continue to treat, such persons as outside the scope of the act. This is the prevailing Board practice with respect to such people as confidential secretaries as well, and it was not the intention of the conferees to alter this practice in any respect.
 
 
 24
 H.R.CONF.REP. NO. 510, 80th Cong., 1st Sess. 35 (1947) (emphasis added).
 
 
 25
 Congress' statement regarding the treatment of confidential employees is actually inconsistent. As the Supreme Court noted in Hendricks County, at the time of the 1947 amendments the Board did not exclude confidential employees from all of the protections of the Act; the Board only precluded them from entering bargaining units. 454 U.S. at 178 n. 10, 102 S.Ct. at 223 n. 10. Congress seemingly signaled its understanding of this practice: "The Board, itself, normally excludes from bargaining units confidential clerks and secretaries to such people as these." H.R.REP. NO . 245, 80th Cong., 1st Sess. 23 (1947). Because Congress' stated intent was to leave the Board's practice undisturbed and the Board's practice was to offer most of the protections of the Act to confidential employees, we cannot say that Congress clearly intended to not provide protection to confidential employees. We are left with the conclusion that the Act is ambiguous.
 
 
 26
 However, we do not address the protections accorded actual confidential employees because we agree with the general counsel that we should focus our attention directly on the protections accorded applicants and not reach the question indirectly through Peerless, Wheeling Electric, and Pacific American.
 
 
 27
 Pursuant to the Board's interpretation of the Act, an employer could not refuse to hire a nonemployee applicant solely on the ground of membership in a union or past union activities; in order to defeat a charge of discrimination, the employer would "have to prove by objective evidence that it has reasonable grounds for believing that an applicant will be disloyal or will impair business operations." (emphasis added). Oddly, the scope of that defense is significantly more limited than the defense the Board has accorded employers that discharge current confidential employees.
 
 
 28
 Under previous Board opinions, an employer is entitled to transfer or discharge a confidential employee where the employer can prove that there is "more than a conjectural possibility" that the employee "might" disclose confidential labor relations information. Raytheon Co., 279 N.L.R.B. 245, 248, 1986 WL 53769 (1986). According to the Board, the "suspicion, doubt, or fear that an employee with actual or potential access to confidential labor relations material might divulge or leak it is sufficient to justify an employer's action against an employee." Emanuel Hosp., 268 N.L.R.B. 1344, 1348, 1984 WL 36110 (1984). Thus, circumstances that give rise to the mere possibility of disclosure are sufficient to justify employer action. Illinois Bell Telephone Co., 228 N.L.R.B. 942, 942 n. 1, 1977 WL 8472 (1977). As one ALJ put it, "It appears however, that in the case of suspected destruction of the confidentiality of labor relations materials, the Board has adopted the philosophy of the Roman apothegm that Caesar's wife ought to be above suspicion." Lucky Stores, 269 N.L.R.B. 942, 945, 1984 WL 36275 (1984).
 
 
 29
 Furthermore, the Board has held that any prounion activity on behalf of a confidential employee is sufficient to justify an employer's concern that the employee would potentially divulge confidential information and to protect the employer from liability for transferring or terminating the employee. In Raytheon Co., the Board found the fact that a confidential employee attended one union meeting was sufficient to justify her employer's concern that she might divulge confidential information and her subsequent removal. 279 N.L.R.B. at 248-50. Similarly, in Emanuel Hospital, the Board found that an employer was justified in removing a confidential employee where she opined that she hoped the union would win the representational election and she had politicked for the union. 268 N.L.R.B. at 1348-49. See also Illinois Bell, 228 N.L.R.B. 942; Joseph Schlitz Brewing Co., 211 N.L.R.B. 799, 1974 WL 5107 (1974).
 
 
 30
 There is one significant limitation to this defense. An employer cannot escape liability where its action was motivated not by a genuine desire to protect its confidential information but rather by a desire to retaliate against the individual for their union activities. Lucky Stores, 269 N.L.R.B. at 945. Absent such a retaliatory motive, an employer is justified in transferring or terminating a confidential employee where, even if solely because of that employee's prounion activities, the employer perceived of the possibility that the employee might divulge confidential information.
 
 
 31
 The Board's prior opinions relative to a legitimate business defense for transferring or discharging current confidential employees set forth a defense significantly broader than the defense it laid down in this case for applicants for confidential positions, under which an employer (1) cannot act based solely on the applicant's union activities and (2) must show that the applicant will be disloyal. We see no reason for the disparity in treatment between applicants and current confidential employees. Why should an employer be able to discharge a confidential employee because of prounion sentiments and yet not be able to decline to interview an employee who evidences identical prounion sentiments? Similarly, why should an employer be required to prove that an applicant will divulge confidential information in order to justify not considering that individual, where the employer could terminate a confidential employee based on the possibility that the individual might divulge confidential information? We find that there is no rational basis for not allowing an employer to decline to consider or hire someone for a reason which is sufficient to justify terminating a current employee. The question we must now decide is which of the two defenses has a more rational basis under the Act.
 
 
 32
 The Board justified the more restrictive defense solely on the general policy ground that allowing an employer to discriminate against applicants for positions based on their prior union activity would act as a disincentive for individuals to join unions, citing Phelps Dodge. However, the Court in Phelps Dodge did not consider the implications of requiring an employer to hire union members for confidential positions--positions in which those employees' protected rights would, at the very least, be curtailed (e.g., by being excluded from bargaining units).
 
 
 33
 In support of the mere possibility defense, the Board has recognized that an employer has a "legitimate desire to protect the confidentiality of its labor relations matters from disclosure to others." Joseph Schlitz, 211 N.L.R.B. at 799. The Board's recognition of an employer's right to keep its confidential labor materials confidential is consistent with the reason for excluding confidential employees from bargaining units: "Indeed such is precisely the basis on which the Board has held that individuals in a confidential relationship with the company with regard to labor matters should be excluded from bargaining units." Illinois Bell, 228 N.L.R.B. at 944.
 
 
 34
 Allowing an employer to terminate confidential employees where there is the possibility that they may divulge confidential information alleviates many of the concerns raised to justify excluding confidential employees from the protection of the Act overall. The only Supreme Court discussion of this issue is in Justice Powell's concurring and dissenting opinion in Hendricks County:
 
 
 35
 Confidential employees might join picket lines, sign petitions advocating the cause of labor, speak out against management at employee meetings, and engage in all manner of concerted activity. Even in the midst of labor-management strife, the confidential secretaries to the top managers of the company, with daily access to the company's bargaining positions, might convey confidential information as to these positions to the union, as well as take their place on the picket lines. The company would be unable to dismiss them or demote them, at least without the risk of an unfair labor practice charge being filed.
 
 
 36
 Hendricks County, 454 U.S. at 197-98, 102 S.Ct. at 232 (Powell, J., concurring in part and dissenting in part).
 
 
 37
 The Board's pronouncement in this case that an employer is required to have objective evidence, unrelated to the applicant's union membership or activities, that an applicant will be disloyal is problematic for two reasons. First, it rests on much less solid policy footing. The only policy basis articulated by the Board supports protection for applicants in general. However, as the Board implicitly recognized in Pacific American, the general policy of not discouraging employees from union activity by protecting applicants for employment does not justify protecting all applicants for employment. 98 N.L.R.B. at 596-97. The reason the Board excluded nonemployee applicants for supervisory positions from protection under the Act is because it would make no sense to accord them protection as applicants where they had none as actual supervisors. Id. at 596. Second, the defense outlined by the Board in this case requires an employer to make an almost impossible showing. Short of an applicant confessing his intent to disclose confidential information, an employer would be very hard pressed to prove that the applicant will be disloyal.
 
 
 38
 We recognize the validity of the Board's concern that discrimination against applicants for confidential positions might act as a disincentive against individuals joining or supporting unions. However, that concern does not justify effectively overriding an employer's legitimate business interest in protecting its confidential labor relations materials from prospective employees whose loyalty it reasonably questions. As the Supreme Court stated in American Ship Building Co. v. NLRB,
 
 
 39
 [W]e have consistently construed [sec. 158(a)(3) ] to leave unscathed a wide range of employer actions taken to serve legitimate business interests in some significant fashion, even though the act committed may tend to discourage union membership. Such a construction of [sec. 158(a)(3) ] is essential if due protection is to be accorded the employer's right to manage his enterprise.
 
 
 40
 380 U.S. 300, 311, 85 S.Ct. 955, 963-964, 13 L.Ed.2d 855 (1965). The mere possibility defense provides for the Board's concern, as well as the employer's protection, by acting as a defense to a charge of discrimination only when the Board finds that the employer's motives were legitimate and not retaliatory.
 
 
 41
 For the foregoing reasons, we hold that the Board's decision in the instant case requiring an employer to prove with objective evidence that the applicant will be disloyal with evidence other than the applicant's union membership or past union activities is not a rational construction of the Act. Instead, the Board's defense to employers who terminate confidential employees where there is more than a conjectural possibility of disclosure is also a proper defense against charges of discrimination in the hiring for confidential positions with a labor nexus.
 
 
 42
 Of course, the mere possibility defense to not hiring applicants only applies to applicants for positions that involve access to confidential labor relations material, which, by definition, includes labor nexus positions.[5] Under the Board's perception of prevailing law, it did not matter whether the confidential secretary position had a labor nexus or not, the employer was unable to prove with objective evidence, other than the applicants' past union membership or activities, that they would have been disloyal if hired. Therefore, the Board did not need to make a determination as to whether the position had a labor nexus; it could, as it did, merely assume the existence of a labor nexus. However, under the rule of law we set forth today, whether the position has a labor nexus is decidedly relevant. If the position is one with a labor nexus, the employer may defend against the unfair labor practice by showing a possibility that the applicants would divulge confidential material. If the position does not involve access to confidential labor relations material, the defense is unavailable.
 
 
 43
 Petitioner invites us to review the record and make a determination that the confidential secretary position at issue did indeed have a labor nexus. We decline this invitation. The question of whether an individual position has a labor nexus is an application of law to fact left, for first impression, with the Board. If the Board finds it to be a confidential position with a labor nexus, the Board must then reach the issue of whether the employer adequately proved the mere possibility defense. As the Board opinions relative to that defense make clear, whether the defense protects an employer from liability depends upon whether the possibility of disclosure or a different, improper motive caused the employer to not interview or hire the applicants. See Lucky Stores, 269 N.L.R.B. at 945. Questions of motive are questions of fact left with the Board in the first instance. NLRB v. Rich's Precision Foundry, Inc., 667 F.2d 613, 626 (7th Cir.1981). Consequently, we remand this portion of the case to the Board so that it can make those determinations.B
 
 
 44
 E & L challenges the Board's decision that E & L violated §§ 158(a)(1) and (3) by discriminating against three of the union members relative to the check-in dispatch supervisor position held by Vern Joyner. E & L argues that Joyner's disciplinary authority, combined with multiple secondary indicia of supervisory status, dictate the conclusion that Joyner's position is supervisory and therefore outside the protections of the Act. The general counsel counters that Joyner did not exercise independent judgment in disciplining employees and that E & L did not adequately prove secondary indicia of supervisory status.[6]
 
 
 45
 The Board's determination as to whether a particular position is supervisory within the meaning of § 152(11) is, as an application of law to fact, reviewed under the "substantial evidence" standard. NLRB v. Winnebago Television Corp., 75 F.3d 1208, 1212 (7th Cir.1996). "Substantial evidence means evidence that reasonable minds might accept as adequate to support a conclusion." Id. (quoting Central Transport, Inc. v. N.L.R.B., 997 F.2d 1180, 1184 (7th Cir.1993)).
 
 
 46
 The definition of "supervisor" is contained in § 152(11):
 
 
 47
 The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 48
 29 U.S.C. § 152(11). An individual need not meet all of the criteria listed in § 152(11) in order to qualify as a "supervisor." Indeed, it is well settled that an individual who meets only one of the criteria qualifies as a "supervisor" under § 152(11). Winnebago Television, 75 F.3d at 1212.
 
 
 49
 The Board found that Joyner lacked supervisory status because the incidents where he issued "nonautomatic" reprimands were "isolated and sporadic." Implicit in the finding that certain of Joyner's reprimands were "nonautomatic" is that they required Joyner to use independent judgment in deciding to issue them, a fact borne out by the record.
 
 
 50
 Joyner issued various types of reprimands, most of which did not require Joyner to use his independent judgment. The automatic reprimands included those issued for driving over hours, failing to call in when empty, and failing to check serial numbers. Given a certain set of circumstances set forth in either the Department of Transportation regulations, the collective bargaining agreement, or company policy, Joyner was required to issue those reprimands. However, Joyner issued another type of reprimand that was not automatic: he issued reprimands to drivers for cargo damage caused by the drivers while they were responsible for their trucks.
 
 
 51
 Joyner testified regarding the process he follows in issuing cargo damage reprimands. The following testimony relates to one particular instance where he issued a reprimand:
 
 
 52
 Q. What is this document?
 
 
 53
 A. This document is a reprimand that I issued driver Harold Dovichi for minor cargo damage.
 
 
 54
 Q. Does your signature appear on it?
 
 
 55
 A. Yes, sir. It does.
 
 
 56
 Q. Did you issue it to the driver in question in person?
 
 
 57
 A. Yes, sir. I did.
 
 
 58
 Q. What preceded the issuance of this reprimand, to the best of your knowledge?
 
 
 59
 A. Upon reviewing Mr. Dovichi's bills of lading, I noticed that one of the units had sustained some damage. I asked Mr. Dovichi to come around and explain to me, to help me understand the circumstances involved in this damage, and he did.
 
 
 60
 Q. As a result of that interview and your review of the documents, did you make a judgement?
 
 
 61
 A. Yes, sir. I sure did.
 
 
 62
 Q. And what was your judgement?
 
 
 63
 A. My judgement was that this damage was a result of Mr. Dovichi's carelessness and negligence.
 
 
 64
 Thus, as the Board seemed to recognize, Joyner was required to utilize his independent judgment in determining whether the driver was or was not at fault for the relevant damage. Based upon that determination, Joyner would either issue or not issue a reprimand. Joyner testified that he issued six cargo damage reprimands between April 30 and June 1, 1991.
 
 
 65
 Even though Joyner exercised independent judgment in issuing cargo damage reprimands, the Board declined to find him a statutory supervisor because it found that he only exercised his disciplinary authority in "isolated and sporadic" incidents. The Board applied the wrong test to the case at hand. It is well settled that if an individual is shown to exercise supervisory authority, the frequency with which he exercises that authority does not impact the necessary conclusion that he is a statutory supervisor. American Diversified Foods, Inc. v. NLRB, 640 F.2d 893, 896 (7th Cir.1981). The Board has created a different rule for individuals who are normally rank-and-file employees, but who by virtue of substituting for statutory supervisors occasionally exercise supervisory authority: "[I]t is clearly established that an employee who substitutes for a supervisor may be deemed a supervisor only if that individual's exercise of supervisory authority is both regular and substantial." Hexacomb Corp., 313 N.L.R.B. 983, 984, 1994 WL 69656 (1994). An employee's exercise of supervisory authority which is "irregular and sporadic" is insufficient to confer supervisory status. Id.; see also PATRICK HARDIN, 2 THE DEVELOPING LABOR LAW 1613 (3d ed. 1992) (noting the different treatment of employees who infrequently exercise supervisory authority while full-time supervisors and those who sporadically exercise supervisory authority while rank-and-file employees substituting for supervisors). Joyner issued the cargo damage reprimands while exercising his authority as a check-in dispatch supervisor, not while substituting for a supervisor. As a result, the frequency with which he issued the reprimands is irrelevant.
 
 
 66
 In support of Joyner's status as a statutory supervisor, E & L argues that the record also reflects several "secondary indicia" of his supervisory status. The general counsel correctly points out that E & L failed to offer sufficient proof of some of the posed indicia. However, E & L did provide sufficient proof regarding other indicia: Joyner uses the title of supervisor; he is salaried; he identifies with management and attends management meetings; and he is one of two first-line supervisors who oversee a work force of sixty-nine drivers. Although not determinative on their own, where one of the enumerated indicia in § 152(11) is present, secondary indicia support a finding of statutory supervisor. HARDIN, 2 THE DEVELOPING LABOR LAW at 1611-12. Because the record shows that Joyner exercised the authority to discipline fellow employees and maintained multiple secondary indicia of supervisory status, the Board erred in holding that he was not a statutory supervisor.
 
 
 67
 E & L argues that if we find Joyner to be a statutory supervisor, then E & L cannot be found liable for allegedly discriminating against the three union members because they were not employed by E & L at the time they applied for the position. In support of its argument, E & L points to Pacific American, where the Board held that nonemployee applicants for a supervisory position are not protected by the Act. 98 N.L.R.B. at 596-97. Intervenor union disagrees, arguing that the Board in Pacific American actually extended the protection of the Act to all current employees, regardless of their employer, who apply for supervisory positions. See id. at 597-98 n. 25. Because the three union members were employees of Nu-Car at the time they provided their resumes to E & L, the union argues, they were protected by the Act.
 
 
 68
 The validity of the union's interpretation is doubtful given subsequent Board decisions interpreting Pacific American as only providing the Act's protections to applicants for a supervisory position who are currently employees of the employer with whom they are applying. See, e.g., James F. Stanford, Inc., 249 N.L.R.B. 623, 624, 1980 WL 11427 (1980); Mapes Hotel, Inc., 230 N.L.R.B. 61, 61 n. 2, 1977 WL 8925 (1977). Nevertheless, we cannot pass on the validity of the union's interpretation because we have been provided with no evidence that the three union members were employees at the time the alleged discrimination occurred (when the interviewees were selected in June or when the hiring decision was made in July). The only evidence of their employment is that with Nu-Car, and all three left Nu-Car in March.
 
 
 69
 Thus, the traditional interpretation of Pacific American remains, and we apply it to the case at hand, denying enforcement to the charge that E & L discriminated against the three union members relative to the check-in dispatch supervisor position.
 
 C
 
 70
 The Board found that E & L violated §§ 158(a)(1) and (3) by refusing to consider the four union members for the temporary clerical positions filled by Kelly Temporary Services employees. E & L challenges this finding on two grounds. First, E & L maintains that the Board lacked substantial evidence of antiunion animus. Second, E & L claims that it had a legitimate business reason for not considering the four union employees for the temporary clerical positions. The general counsel responds by arguing that the Board's decision on both points is more than adequately supported. We will uphold the Board's findings if supported by "substantial evidence." §§ 160(e), (f).
 
 
 71
 The Board bears the burden of proving by a preponderance of the evidence that (1) the employer knew that the discriminatees were members of the union, (2) the employer took an employment action adverse to the discriminatees, and (3) the discriminatees' union membership or activities were a motivating factor in the employer's decision. Wright-Line, Inc., 251 N.L.R.B. 1083, 1083, 1088-89, 1980 WL 12312 (1980), enforced, 662 F.2d 899 (1st Cir.1981). Once the Board has made that showing, the burden shifts to the employer to show that it would have taken the same action for legitimate business reasons. NLRB v. Transportation Management Corp., 462 U.S. 393, 401-04, 103 S.Ct. 2469, 2474-75, 76 L.Ed.2d 667 (1983). The employer cannot meet his burden simply by articulating a legitimate nondiscriminatory reason. The employer must affirmatively introduce enough evidence to persuade the Board that the challenged action would have taken place regardless of the employee's protected activity. Carry Companies of Ill., Inc. v. NLRB, 30 F.3d 922, 927 (7th Cir.1994); HARDIN, 1 THE DEVELOPING LABOR LAW at 197-98; see also Hyatt Hotels Corp., 296 N.L.R.B. 259, 260, 1989 WL 224313 (1989); Hicks Oils & Hicksgas, Inc., 293 N.L.R.B. 84, 85, 1989 WL 223829 (1989).
 
 
 72
 There is substantial evidence in the record to support the Board's determination that E & L knew the four office employees were members of the union and that E & L failed to consider their applications in filling the temporary positions. E & L argues that there was not substantial evidence to support the finding that antiunion animus was a motivating factor in its decision.
 
 
 73
 The ALJ did not make a specific finding that antiunion animus motivated E & L's decision to not consider the union employees for the temporary positions. Instead, the ALJ found that E & L acted pursuant to a general plan to keep all of its office staff nonunion. The ALJ primarily relied upon three factors in making that finding: (1) the statements alleged to be threats made by Schaeffer and O'Reilly, (2) E & L's secretive means of soliciting resumes of the nonunion office workers, and (3) E & L's questioning of the nonunion office workers as to why they had not joined the union.
 
 
 74
 Substantial evidence supports the ALJ's finding that E & L possessed antiunion animus. Indeed, Schaeffer's statement that E & L would not hire the union applicants constitutes direct evidence of E & L's general intent to discriminate against the former union members. True, "animus alone does not establish motivation," Master Housekeepers, Inc., 287 N.L.R.B. 908, 909, 1987 WL 90148 (1987); however, the ALJ could have inferred from E & L's conduct that it was engaging in an overall attempt to keep its office free of union sympathizers. Taking actions to ensure an office free of union sympathizers may be legitimate if all of the positions were supervisory (and the applicants were nonemployees). Such actions may also be legitimate under the mere possibility defense if the office only included confidential positions with a labor nexus and the actions were motivated by legitimate concerns of maintaining the confidentiality of labor relations material and not by a desire to retaliate against the union. Raytheon, 279 N.L.R.B. at 249-50; Lucky Stores, 269 N.L.R.B. at 945. However, E & L has made no argument that the temporary clerical positions were supervisory or confidential, and, thus, E & L could not have included the temporary positions within the group of positions for which it was not considering union applicants.
 
 
 75
 E & L's conduct is such that the ALJ was justified in finding that E & L's antiunion animus motivated it to not consider the union applicants for the temporary positions. See Ultrasystems W. Constr., Inc. v. NLRB, 18 F.3d 251, 257 (4th Cir.1994). After spending considerable time perusing the record, we note that this is not an open-and-shut case and that we may well have come to a different conclusion had we reviewed the record de novo; however, that is not our role. NLRB v. Dorothy Shamrock Coal Co., 833 F.2d 1263, 1265 (7th Cir.1987). We must enforce the Board's decision if supported by "substantial evidence," and such is the case here.
 
 
 76
 We next consider whether E & L carried its burden of proving a legitimate business reason for using Kelly Temporary Services employees and for not considering the former Nu-Car clericals for the temporary positions. E & L argues that it turned to Kelly Temporary Services to fill its temporary clerical needs for three reasons. First, it was easier to hire temporaries through an agency than to independently initiate the hiring process. Second, it was easier to terminate a temporary service employee when the work dried up than an independent temporary. Third, it was less expensive to hire temporary employees through an agency than it would have been to hire them independently. The ALJ rejected these reasons as unpersuasive and found that E & L had failed to prove that hiring temporary employees through Kelly Temporary Services was cheaper or otherwise better than hiring the union applicants.
 
 
 77
 The general counsel persuasively argues that E & L failed to carry its burden of proving that it would have hired the Kelly Temporary Services temporaries instead of the former Nu-Car employees as temporaries regardless of its antiunion animus. The general counsel correctly points out that although given the opportunity to do so, E & L failed to show that hiring Kelly Temporary Services employees would have been cheaper than hiring the Nu-Car employees as temporaries. O'Reilly testified that the Kelly employees were cheaper but could not testify as to what E & L paid Kelly for those employees. The company "needed to assemble more than bare assertions or even plausible reasoning; it had to furnish proof." Property Resources Corp. v. NLRB, 863 F.2d 964, 967-968 (D.C.Cir.1988). Further, substantial evidence supports the Board's determination that E & L did not offer persuasive evidence that it would have been more difficult to terminate the Nu-Car employees as temporaries than the Kelly employees. E & L simply offered no evidence on this point. The Board could have found E & L's final explanation--that it was easier to hire Kelly Temporary Services temporaries than the former Nu-Car union members--equally unpersuasive. Although it may have been easier to hire the Kelly Temporary Services temporaries, that was offset by the evidence of the additional training that was required for them versus the former Nu-Car workers who had already done essentially the same work on the same account. Additionally, the former Nu-Car employees' resumes were on file with E & L when they chose to put in an order with Kelly Temporary Services; it would not have been more difficult to first consider them for the temporary positions.
 
 
 78
 We are not saying that an employer cannot justify with legitimate business reasons a decision to turn to a temporary service for temporary help over qualified union applicants for those temporary positions. E & L simply failed to sufficiently support its claim that going through Kelly Temporary Services was better than hiring or at least interviewing the former union employees. Consequently, substantial evidence supports the Board's finding that E & L violated §§ 158(a)(1) and (3) by failing to consider the applicants for the temporary positions.
 
 D
 
 79
 The Board summarily affirmed the ALJ's finding that E & L issued a threat in violation of § 158(a)(1) by virtue of Schaeffer's statement that E & L "will not hire the Union office people" and O'Reilly's two statements that "if the clericals were hired they would be nonunion."[7] E & L challenges the ALJ's finding on the grounds that the statements were protected under § 158(c) as truthful expressions of fact or opinion and that there was no evidence that the statements were disseminated to the former office employees.
 
 
 80
 An employer violates § 158(a)(1) where it makes statements that reasonably tend to coerce employees in the exercise of their protected rights, regardless of whether the statements do, in fact, coerce. NLRB v. Shelby Memorial Hosp. Ass'n., 1 F.3d 550, 560 (7th Cir.1993). The breadth of § 158(a)(1) is limited by § 158(c), which provides that an employer's expression of its "views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice under any of the provisions of the Act, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Whether a statement is coercive must be determined in the context in which it was made. NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). The Board "has the primary responsibility for determining whether statements are to be construed as threats," NLRB v. Harrison Steel Castings Co., 728 F.2d 831, 837 (7th Cir.1984), and we will not upset the Board's findings if supported by substantial evidence on the record and a reasonable basis in the law.
 
 
 81
 We need only look to E & L's second argument, that because there was no evidence that the statements were disseminated to the former union office employees there is no basis for finding the statements reasonably coercive, to decide this issue. Section 158(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees" in the exercise of their section 7 rights. In determining whether a statement is coercive, we look to the employee who heard the statement. That includes the persons to whom the statement was addressed, see N.L.R.B. v. Sherwood Trucking Co., 775 F.2d 744, 750 (6th Cir.1985); Sambo's Restaurant, Inc., 269 N.L.R.B. 1187, 1189, 1984 WL 36291 (1984); people who overheard the statement, see Action Auto Stores, Inc., 298 N.L.R.B. 875, 904, 1990 WL 122509 (1990); and people to whom the statement was disseminated, see generally Evansville & Ohio Valley Transp. Co., 223 N.L.R.B. 184, 186, 1976 WL 7909 (1976) (finding no violation because statement was not disseminated to employees); Hemco Corp., 194 N.L.R.B. 789, 790, 1971 WL 4096 (1971) (same). Where the people who heard the statement could not have been coerced, the statement is not a violation of § 158(a)(1). See Evansville & Ohio Valley, 223 N.L.R.B. at 186 (statement only heard by a supervisor); Hemco, 194 N.L.R.B. at 790 (statement only heard by a confidential employee). Requiring as a prerequisite to a § 158(a)(1) violation that the employee(s) who heard the statement actually could be coerced by it is consistent with the purpose of proscribing threatening communications. Statements that do not reach people who could be coerced are, by definition, not unfair labor practices in that they could not reasonably tend to coerce.
 
 
 82
 In this case, the general counsel did not show, and the ALJ did not find, that the former office workers actually heard the statements made by Schaeffer or O'Reilly. The ALJ found that the two statements made by O'Reilly and the one made by Schaeffer violated § 158(a)(1) because they were made to union steward Brown, who is also an E & L employee. That would have been sufficient if the statements could reasonably have tended to coerce Brown, but they could not. First, the statements would only reasonably tend to coerce someone interested in working as an E & L clerical, and Brown was an E & L driver. Second, at the time the statements were made, Brown, who had been a union driver with Nu-Car, had recently been hired by E & L along with a large number of other union Nu-Car drivers. E & L's drivers were also union. Brown could not reasonably have believed, by virtue of the implication that E & L would discriminate against the former union clerical applicants, that E & L would discriminate against him as a driver because he and many of his former union coworkers had recently been hired.
 
 
 83
 The ALJ's finding that Houseman and Buschman heard Schaeffer's statement to the effect that E & L would be a nonunion office is alone insufficient to support his finding of a § 158(a)(1) violation. First, although the ALJ found that similar comments made by O'Reilly constituted threats, he did not find that these two statements of Schaeffer constituted threats. Instead, the ALJ only found that Schaeffer's statement to Brown that E & L would not hire the union employees was a threat. Second, although the ALJ found Houseman and Buschman to be clerical employees rather than supervisors, the Board specifically declined to adopt that finding, thereby leaving open the question of whether Houseman and Buschman were supervisors. Consequently, the only employee or applicant to hear the "threats" was Brown, who, as explained above, could not have been reasonably coerced.
 
 
 84
 Because neither the ALJ nor the Board found that anyone who could have been coerced by these statements actually heard them, the ALJ's conclusion that the statements constituted threats under § 158(a)(1) is unsupported by the evidence and, therefore, cannot stand.
 
 E
 
 85
 E & L sets forth two arguments for why the general counsel's amendment to the complaint changing the number of allegedly available temporary positions from one position to multiple positions was improper. First, E & L argues that the general counsel's delay in filing the amendment made the amendment untimely. Second, E & L argues that the delay violated its right to due process because, as a result of the delay, E & L was denied a full and fair hearing on the amended charge.
 
 
 86
 We first note that E & L does not have a valid argument that the amendment was untimely. As we held in NLRB v. Complas Indus., Inc., "[a] complaint or an amended complaint, although filed and served after six months, may allege violations not alleged in the charge if they did not occur more than six months prior to the filing and service of the charge, and they are closely related to the violations which are contained in the charge." 714 F.2d 729, 732 (7th Cir.1983). The charged violation, discrimination against the four former Nu-Car employees in the hiring of multiple temporary positions, allegedly occurred on April 5, 1990, less than a month before the charge was filed. Further, the amended violation was closely related to the violations contained in the charge, which generally alleged E & L's discrimination against the four former office employees because of their past union activities.
 
 
 87
 E & L's due process argument also falls short. In NLRB v. Quality C.A.T.V., Inc., we set forth the test for whether an employer's due process rights have been adequately protected when additional charges are presented in an unfair labor practice proceeding: "Whether fair notice is given by way of pleading, or by way of the course of proceeding of a full litigation, the crucial focus is at all times on whether notice was given which provided the party with an adequate opportunity to prepare and present its evidence." 824 F.2d 542, 546 (7th Cir.1987) (quoting Complas Indus., 714 F.2d at 734). The general counsel issued its notice of intent to amend on April 2, 1991. The hearing began on April 8, 1991. At the beginning of the hearing, the ALJ granted the general counsel's motion to amend the complaint and, over E & L's objection, granted E & L an eight-week continuance before it had to present its case so that it could adequately prepare for defending against the amended allegations. Under these circumstances, eight weeks was sufficient time to accord E & L an "adequate opportunity to prepare and present its evidence." This is not a case where E & L was denied the opportunity to prepare its defense against the amended charges or where the delay in notifying E & L of the amended charges precluded E & L from presenting evidence and arguments. Consequently, E & L's due process rights were not violated.
 
 III
 
 88
 For the foregoing reasons, we DENY enforcement in part, GRANT enforcement in part, and REMAND this matter to the Board for further proceedings consistent with this opinion.
 
 
 
 [1]
 Brown began working for E & L on April 2, 1990
 
 
 [2]
 From April 7 to April 19, Kelly provided E & L with one secretary and one data-entry clerk. From April 19 to April 20, Kelly provided E & L with two data-entry clerks. From April 20 to June 1, Kelly provided E & L with two data-entry clerks and one typist. From June 1 until August 31, Kelly provided E & L with two data-entry clerks and two typists
 
 
 [3]
 The "labor nexus" test denotes those employees who, as a result of their close association with management, have traditionally been afforded limited protections under the Act. The NLRB's definition, approved by the Supreme Court in NLRB v. Hendricks County Rural Elec. Membership Corp., provides that employees with a labor nexus include only "those employees who assist and act in a confidential capacity to persons who formulate, determine, and effectuate management policies in the field of labor relations." 454 U.S. 170, 189, 102 S.Ct. 216, 228, 70 L.Ed.2d 323 (1981) (quoting B.F. Goodrich Co., 115 N.L.R.B. 722, 724 (1956))
 
 
 [4]
 We note that the Supreme Court in Hendricks County left open the question to what extent confidential employees are protected by the Act. 454 U.S. at 185 n. 19, 102 S.Ct. at 226 n. 19. Since the Court's decision, the Board has consistently refused to address the question. See, e.g., Crest Mark Packing Co., 283 N.L.R.B. 999, 1000, 1987 WL 89644 (1987); Local No. 980, United Automobile, Aerospace & Agricultural Implement Workers of America, 280 N.L.R.B. 1378, 1378 n. 1, 1986 WL 68773 (1986); Lucky Stores, Inc., 269 N.L.R.B. 942, 942 n. 2, 1984 WL 36275 (1984); Emanuel Hosp., 268 N.L.R.B. 1344, 1344 n. 1, 1984 WL 36110 (1984)
 
 
 [5]
 This case does not present the question of whether only confidential positions with a labor nexus are subject to the mere possibility defense. Indeed, the Board has signaled its intent to apply the defense to a broader class of employees
 The right to take action against an employee in order to protect the confidentiality of labor relations material applies not just to "confidential" employees but to all employees. Confidential employees are not the only employees who may have access to confidential labor relations material. Other employees may have legitimate access to such information and any employee may improperly seek to obtain it.
 Lucky Stores, 269 N.L.R.B. at 945.
 
 
 [6]
 The general counsel also seeks to support the Board's decision by pointing to the ALJ's finding that the disciplinary authority exercised by Joyner was only an attempt to bolster his supervisory status and not a genuine exercise of disciplinary authority. We do not address the merits of this argument because the Board declined to adopt it in its opinion
 Of course, the Board may summarily affirm the decision of an ALJ. United Food & Commercial Wkrs. v. NLRB, 880 F.2d 1422, 1436 (D.C.Cir.1989). Unlike other portions of the ALJ's decision that the Board summarily affirmed, the Board chose to provide its own reasoning in support of the ALJ's finding that Joyner was not a statutory supervisor. We infer that by providing its own reasoning the Board necessarily rejected the ALJ's reasoning as insufficient. For if the Board had agreed with the ALJ's reasons for finding that Joyner's exercise of authority was not genuine, it would not have addressed the merits of that authority. The Board could have supplemented the ALJ's reasoning with its own; however, there is nothing in the Board's opinion to show that was the Board's intent.
 
 
 [7]
 The ALJ actually found that O'Reilly's statements constituted "a threat to deny employees their rights under Section 4 of the Act." Section 4 of the Act relates to administrative matters concerning members and employees of the National Labor Relations Board. 29 U.S.C. § 154. We infer that the ALJ simply made a typographical error and that the ALJ actually intended to say that the statements constituted threats because they denied employees their rights under section 7 of the Act. 29 U.S.C. § 157