NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WINNEBAGO TELEVISION CORPORA-
TION d/b/a WTVO–TV, Respondent.

No. 95–1213.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 24, 1995.

Decided Feb. 9, 1996.

Elizabeth Kinney, National Labor Relations Board, Region 13, Chicago, IL, Aileen A. Armstrong, Linda J. Dreeben, Lisa Richardson Shearin (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, Glenn A. Zipp, National Labor Relations Board, Region 33, Peoria, IL, for Petitioner.

Don S. Lemmer (argued), Kelley, Drye & Warren, Los Angeles, CA, Eugene D'Ablemont, Kelley, Drye & Warren, New York, IL, for Respondent.

Before EASTERBROOK, KANNE, and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

The National Labor Relations Board ("NLRB") ordered Winnebago Television Corporation d/b/a WTVO–TV ("WTVO") to negotiate with the International Brotherhood of Electrical Workers ("Union"), which the NLRB had certified as the exclusive representative of a collective bargaining unit of WTVO's employees. WTVO refused to negotiate, and the NLRB now asks us to enforce its order pursuant to our authority under § 10(e) of the Labor Management Relations Act, 29 U.S.C. § 160(e). This petition raises issues concerning (1) the classification of two of WTVO's employees under the statute governing the determination of collective bargaining units and (2) the disposition of WTVO's request for review of the unit determination. For the reasons discussed below, we deny the petition for enforcement.

I

WTVO is a television station in Rockford, Illinois, affiliated with the National Broadcasting Company ("NBC"). WTVO employs approximately sixty-five people who supervise and staff six departments: administration, production, programming, news, sales, and engineering. WTVO airs locally and network-produced news and entertainment programs, commercials, and public service announcements. It generates the bulk of its revenue by producing commercials and selling commercial airtime, but it does receive some revenue directly from NBC.

The genesis of these proceedings occurred on December 17, 1992, when the Union filed a petition with the NLRB under 29 U.S.C. § 159(c)(1),[1] seeking to represent twenty-two full- and part-time employees in WTVO's production department. At the time of the petition, the Union already represented a bargaining unit of thirteen WTVO engineering technicians. A seven-day hearing took place beginning January 13, 1993, and WTVO and the Union filed final briefs on March 9 and 10, 1993, respectively. In its brief, the Union suggested a unit of seventeen employees. WTVO argued for a "wall to wall" unit encompassing all non-supervisory and unrepresented employees.

The parties' positions regarding the status of two employees, Chris Hilgendorf and Karen Mais, are material to our decision. Hilgendorf works in the production department and directs WTVO's weekday evening newscasts at five, six, and ten o'clock P.M. WTVO characterizes Hilgendorf as a supervisor under 29 U.S.C. § 152(11), who should be excluded from any bargaining unit. The NLRB argues that he did not qualify as a supervisor under § 152(11) and should be included in the bargaining unit. Mais is an assistant to the programming/community af-

---

1. The current Code of Federal Regulations provides for such petitions at 29 C.F.R. §§ 102.60–.61 (1995).

fairs director and is responsible for drafting production orders and programming schedules. WTVO and the Union agreed during the proceedings below that she should be included in any appropriate bargaining unit, the NLRB disagreed, and the question of her placement is currently unresolved.

The NLRB acting regional director ("ARD") decided on July 30, 1993, that the appropriate bargaining unit under 29 U.S.C. § 159(b) consisted of thirteen WTVO employees, which included Hilgendorf and excluded Mais. The ARD directed that an election be held to determine whether the Union would act as representative for the bargaining unit. On August 12, 1993, WTVO requested that the NLRB review the ARD's decision and stay the election pending its review.[2] The NLRB refused to grant the stay, and the election proceeded as scheduled on August 23.

The NLRB issued an order on September 8, 1993. It found that WTVO's request for review had raised a substantial issue only with regard to the placement of Mais and stated that the challenge procedure was the appropriate mechanism for resolving her disputed status. It accordingly amended the ARD's decision to permit her to vote by challenged ballot but denied WTVO's request for review in all other respects. A total of twelve eligible voters cast ballots in the election, which the Union won by a vote of seven to five. The two-vote margin rendered the Mais issue immaterial to the certification decision,[3] and the NLRB regional director[4] certified the Union as the unit's collective bargaining representative on September 22, 1993.[5]

WTVO subsequently refused to bargain with the Union, prompting the Union to file a charge of unfair labor practice on March 21, 1994. The Union amended the charge on May 17, and the regional director issued a complaint and notice of hearing on June 1. WTVO answered the complaint on June 10, stating that its refusal to bargain was based upon the ARD's erroneous determination of the appropriate bargaining unit and the consequently flawed certification issued by the regional director. General counsel for the NLRB moved for summary judgment on August 11, 1994, stating that WTVO was precluded from raising its assigned issues by virtue of the regional director's certification decision of September 22, 1993. The NLRB issued a notice to show cause on August 17, which allowed WTVO to brief the issue and explain why summary judgment should not be granted against it. WTVO argued that summary judgment was inappropriate because three issues warranted the attention of either an administrative law judge or the NLRB: (1) Hilgendorf's inclusion in the unit, (2) Mais's exclusion from the unit, and (3) the limitation of the unit only to production department employees.

A three-member panel of the NLRB issued a decision and order on September 23, 1994. It first found that WTVO had failed to adduce any evidence concerning the unit determination that was unavailable to it for use in the earlier representation proceeding before the ARD.[6] With regard to the dispute concerning Hilgendorf's status, the NLRB determined that WTVO's reliance on a recent United States Supreme Court decision, *NLRB v. Health Care & Retirement Corp.,* — U.S. —, 114 S.Ct. 1778, 128 L.Ed.2d

---

2. Such requests for review are authorized under 29 C.F.R. § 102.67 (1995).

3. Her status remained an issue with respect to her inclusion in the represented class of employees. The parties do not claim that her vote could have made a difference in the election result, but there is disagreement as to the prejudicial effect of her exclusion. As discussed below, we need not address these arguments because the question concerning Mais is not ripe for our review.

4. Jurisdiction over these proceedings was transferred from the acting regional director of Region 26 to the regional director of Region 33.

5. If the number of challenged ballots are insufficient to affect the election results, the NLRB regional director is authorized to certify the election results and the choice of a bargaining representative, where appropriate. 29 C.F.R. § 102.69(b) (1995).

6. The NLRB's regulations specify that a denial of a request for review made under 29 C.F.R. § 102.67 "shall constitute an affirmance of the regional director's action which shall also preclude relitigating any such issues in any related subsequent unfair labor practice proceeding." 29 C.F.R. § 102.67(f) (1995).

586 (1994), was misplaced and insufficient to require reconsideration of the ARD's unit determination with regard to Hilgendorf. Nowhere did the decision and order discuss the question concerning Mais.

On the issue of alleged unfair labor practice, the NLRB panel focused on the answer filed by WTVO on June 10, 1994, in response to the regional director's complaint. It reasoned that WTVO's admissions in the answer concerning the Union's certification and its own "technical refusal to bargain" fatally undermined its contrary statements in the response to the notice to show cause. The NLRB stated that, having failed to dispute "the authenticity of that correspondence [i.e., the answer] in its response to the Notice to Show Cause," WTVO had effectively admitted to refusing to bargain with the Union as alleged in both the complaint and the motion for summary judgment.

Based upon these findings, the panel granted summary judgment in favor of the NLRB and ordered WTVO to commence bargaining with the Union. WTVO steadfastly refused, and the NLRB filed the instant petition for enforcement on January 30, 1995. We have jurisdiction to entertain this petition for enforcement under 29 U.S.C. § 160(e).

## II

In addition to conferring jurisdiction, 29 U.S.C. § 160(e) prescribes the scope of our review. We are authorized to set aside, enforce, or modify the NLRB's decision but must confine any such action to an issue that has actually been determined by the NLRB. 29 U.S.C. § 160(e) (conferring upon us jurisdiction "of the proceeding and of the question determined therein"). We may not consider objections that were not previously submitted to the NLRB unless the failure to make those objections can be "excused because of extraordinary circumstances." *Id.* In cases where the NLRB has failed to address properly raised objections, we may be constrained to remand the matter to the NLRB for further consideration in light of the unambiguous command of § 160(e).

In considering those issues within the scope of our review, we are obligated to affirm the NLRB's findings of fact if they are "supported by substantial evidence on the record considered as a whole." *Id.; see also NLRB v. O'Daniel Trucking Co.,* 23 F.3d 1144, 1148 (7th Cir.1994). The substantial evidence test is deferential: "Substantial evidence means evidence that reasonable minds might accept as adequate to support a conclusion." *Central Transport, Inc. v. NLRB,* 997 F.2d 1180, 1184 (7th Cir.1993). We may neither "dabble in fact-finding" nor displace the NLRB's factual determinations simply because we envision a different conclusion had we reviewed the record *de novo. K-Mart Corp. v. NLRB,* 62 F.3d 209, 212 (7th Cir.1995) (citing *NLRB v. P*I*E Nationwide, Inc.,* 923 F.2d 506, 513 (7th Cir.1991)).

The Labor Management Relations Act empowers the NLRB to define the contours of appropriate bargaining units. 29 U.S.C. § 159(b). These determinations are firmly within the discretion of the NLRB and are rarely to be disturbed. *South Prairie Constr. Co. v. Operating Engineers,* 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382 (1976). Nevertheless, although abstaining from fact-finding, we will conduct "a thorough review of the record to ensure that the unit determination is not unreasonable, arbitrary or capricious, or unsupported by substantial evidence." *NLRB v. Joe B. Foods, Inc.,* 953 F.2d 287, 293 (7th Cir.1992).

Selecting an appropriate bargaining unit requires the NLRB to apply the classifications of 29 U.S.C. § 152 to its findings of fact in each particular case. We review the NLRB's application of law to fact under the substantial evidence standard, and "the Board's reasonable inferences may not be displaced on review even though [we] might justifiably have reached a different conclusion had [we] considered the matter *de novo.*" *U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1313–14 (7th Cir.1991) (en banc) (citation omitted), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992).

## III

In its decision and order of September 23, 1994, the NLRB made no determina-

tion concerning Mais. In its order of September 8, 1993, however, the NLRB ordered that she be allowed to vote by challenged ballot and that her placement be determined through the challenge procedure. At oral argument, counsel for the NLRB stated that the resolution of her status depended upon our decision concerning Hilgendorf. He requested that we remand the matter to the NLRB for a final determination of Mais's placement either within or without the bargaining unit should we find Hilgendorf to have been wrongly included in the unit.

WTVO has argued that the election results are irreparably flawed due to the prejudicial effect of Mais's uncertain status and exclusion from the unit at the time of the election. It contends that even if we find her exclusion to be proper, we should nevertheless direct that a new election be held on the basis of the alleged prejudice. WTVO's argument rests upon a faulty premise, however. We are not empowered to address the question concerning Mais because that issue has not been determined by the NLRB. *See* 29 U.S.C. § 160(e). We agree with counsel for the NLRB that the question would become ripe for its determination should we deny the petition based upon the placement of Hilgendorf. There is no disagreement that the NLRB will resolve challenges that are potentially dispositive of an election. *Heritage Fire Protection, Inc.*, 307 N.L.R.B. 824, 1992 WL 133915 (1992), *enforcement granted*, 33 F.3d 55 (6th Cir.1994); *CWM, Inc.–Port Arthur, Employer*, 306 N.L.R.B. 495, 1992 WL 40813 (1992); *see also* 29 C.F.R. § 102.69. The fulcrum of this dispute is therefore the appropriate classification of Hilgendorf under 29 U.S.C. § 152.

## IV

### A

Congress enacted the Labor Management Relations Act in 1935 to prevent industrial strife that threatened the growth of the Nation's burgeoning interstate commerce. 29 U.S.C. § 151 *et seq.* As originally written, the Act did not exclude supervisors from the definition of employees accorded protection under the Act, and the United States Su-

preme Court decided in 1947 that, absent language to the contrary, supervisors were within the ambit of the Act's coverage. *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

Congress reacted to *Packard Motor Car Co.* by excluding supervisors from the Act's coverage in the Labor Management Relations Act of 1947. *See Health Care & Retirement Corp.*, —— U.S. at ——, 114 S.Ct. at 1787 (Ginsburg, J., dissenting) (tracing the Act's legislative history). The 1947 legislation excluded "any individual employed as a supervisor" from the class of "employees" defined in § 2(3). The same legislation replaced the prior § 2(11) of the Act with the following definition of supervisor:

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

It is settled law in this circuit that this section is to be read disjunctively. An employee who possesses any one of the iterated criteria qualifies as a supervisor within the meaning of § 152(11). *Joe B. Foods*, 953 F.2d at 294 (collecting cases and quoting *NLRB v. Ajax Tool Works, Inc.*, 713 F.2d 1307, 1311 (7th Cir.1983)). We have previously characterized "supervisor" as a term of art because there are a great number of scenarios in which an employee might exercise some supervisory authority without qualifying as a supervisor under § 152(11). *Children's Habilitation Ctr., Inc. v. NLRB*, 887 F.2d 130, 131 (7th Cir.1989). Informing the application of this "nondirective statutory definition" is the goal that motivated Congress in 1947 to exclude supervisors from the coverage of the Act: maintaining an equilibrium of power in the employer-union relationship. *Id.* Allowing supervisors to join employee unions would threaten the integrity of a business's decision-making hierarchy and

would create potential conflicts of interest as supervisors balanced their loyalties to the union with those to their employer. *Id.* at 132. Certainly, the text of § 152(11) is the starting point for our analysis. But it is important to remain mindful of the underlying policy considerations as we examine the NLRB's application of § 152(11) to the facts of the present case.

 The instant petition involves, among other things, the NLRB's application of the § 152(11) definition of "supervisor" to the facts concerning Hilgendorf's role at WTVO. While we adhere to the generally accepted standard of review discussed above, the fact of the matter is that "[a]n administrative agency, like any other first-line tribunal, earns—or forfeits—deferential judicial review by its performance." *Children's Habilitation Ctr.*, 887 F.2d at 132. In the context of classifying supervisors, the NLRB's manipulation of the definition provided in § 152(11) has earned it little deference. *Id.* (collecting authority). We remain mindful of the statutory prescription of judicial restraint but note that such restraint "does not entail complete abdication of the judicial role." *K–Mart Corp.*, 62 F.3d at 212 (citing and quoting cases).

### B

 The ARD based his classification of Hilgendorf primarily on two findings of fact: (1) Hilgendorf's contributions to WTVO personnel decisions amounted to general assessments and were not commensurate with the role of a supervisor; and (2) Hilgendorf was not required to exercise independent judgment in his oversight of the production department employees after 5:30 P.M. The ARD based these findings on the testimony of several persons but placed great emphasis upon Hilgendorf's own testimony, in which he downplayed his role particularly regarding personnel decisions.

Viewing the evidence as a whole, we are unable to conclude that there existed a substantial evidentiary basis for classifying Hilgendorf as an employee and not as a supervisor under 29 U.S.C. § 152. Substantial evidence is, after all, "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). The evidence demonstrates that Hilgendorf easily qualifies as a supervisor under the strict language of the statute. In addition, the public policy underlying § 152(11) also counsels in favor of Hilgendorf's classification as a supervisor, given his position in the chain of command at WTVO.

### C

There is ample evidence in the hearing record demonstrating that Hilgendorf contributed much more than "general assessments" to certain personnel decisions. One who possesses authority to effectively recommend the hiring, promotion, or transfer of employees qualifies as a supervisor under § 152(11). The record clearly shows that Hilgendorf played a dispositive role in several such decisions. We will not reproduce every tidbit of testimony supporting this conclusion, but several excerpts are instructive.

1. *WTVO's decision to hire Dawn Susan Marks and David Charles*

Terry Kowalski is the creative services manager at WTVO, which places him in charge of the promotion, commercial facilitation, and production facets of WTVO operations. He testified that Dawn Susan Marks and David Charles were hired on the basis of Hilgendorf's "judgment" that they would be compatible with the existing production staff:

Q. What did you base your decision [to hire Dawn Susan Marks] on?

A. Off of Chris [Hilgendorf's] judgment.

Kowalski repeated this a few moments later and then discussed the decision to hire David Charles:

Q. And what did you base the decision to hire her on?

A. Chris [Hilgendorf]. He's got to work with her.

Q. Now you mentioned a Mr. Charles.

A. Right.

Q. He's a production assistant.

A. That's correct.

Q. Okay. And in the production department too?

Q. Does he work evenings?

A. Yes. Still does.

Q. And that's when Ms. Marks works?

A. That's correct.

Q. Okay. And what, if anything, did Mr. Hilgendorf have to do with the hiring of Mr. Charles?

A. Again, after I had a preliminary discussion with Dave, Chris had discussion [sic] and again gave me his support. And he basically told me that he [i.e., Charles] would make a good part of the staff. So I hired him.

This testimony demonstrates that Hilgendorf's recommendation was the determinative factor in both hiring decisions. Kowalski specifically characterized his conversation with Mr. Charles as "preliminary," and the only reasonable inference from this testimony is that a later conversation or interview would guide the decision whether to hire Mr. Charles. While Kowalski had made preliminary assessments of both persons' qualifications, the record illustrates that Hilgendorf effectively recommended that both persons be hired.

2. *WTVO's decision to promote Tom Kuelling*

The evidence demonstrates that Hilgendorf was responsible for the promotion of Tom Kuelling from part-time to full-time technical director. Kowalski testified that Mr. Kuelling became eligible for the promotion in the wake of another employee's departure and that Hilgendorf provided the crucial recommendation:

Q. Okay. And what, if anything, did Mr. Hilgendorf have [to do] with respect to Mr. Kuelling going from part time work to full time work?

A. Knowing that we needed to fill a vacancy with Rick Hefner leaving, he recommended Tom go full time, having the abilities, which really only Chris would know, since I'm not around at night.

Q. And what did Mr. Hilgendorf tell you about Mr. Kuelling?

A. That he would be capable of technical directing news.

Q. And did you make an independent investigation of that?

A. Well, I already knew Tom, from the time when he comes in at 2:00. I had a pretty good understanding of what he was capable of doing, but not to the extent that Chris knew.

Q. And what reliance, if any, did you place on Mr. Hilgendorf's recommendation to make Mr. Kuelling full time?

A. I relied solely on Chris, really.

The only reasonable conclusion that flows from this testimony is that Hilgendorf was solely responsible for Mr. Kuelling's promotion. The fact that Hilgendorf may not have executed the decision does not undermine his predominant role in reaching that decision.

3. *WTVO's decision to transfer Dion Kapsimalis*

Kowalski testified that Hilgendorf raised a problem concerning Dion Kapsimalis's ability to learn the information necessary to effectively function in his capacity in the production department. Kowalski stated that it was Hilgendorf's recommendation that precluded the termination of Mr. Kapsimalis and resulted in his being transferred to a position better suited to his abilities:

Q. Did Mr. Hilgendorf say anything to you about that?

A. Absolutely.

Q. And what did he say to you?

A. That it was slowing things down, that [Kapsimalis] couldn't keep up with everyone else.

 * * * * * *

But it was Chris' recommendation that we had to do something. I was able, rather than just to terminate his employment, [to] give him another opportunity in the station.

Q. Were you going to terminate his employment?

A. I had planned on it, yes.

Q. All right. And how come you did not terminate his employment?

A. (No response.)

Q. Why didn't you terminate his employment?

A. Well, because another opportunity existed. He had moved from Chicago, and basically I felt that he was a nice guy.

Q. And did Mr. Hilgendorf have anything to do with your not terminating Dino [sic]?

A. Uh, Chris and I had discussed the opening in news. And he fully supported this change and felt that it would be positive for the department, rather than just letting someone go.

Q. All right. And would you have made the change without Mr. Hilgendorf's support?

[Objection by counsel for the Union; hearing officer permits the witness to answer.]

A. If Chris had told me don't put him in news, we need to just get rid of this guy, yes, he would have been gone.

The bottom line is that Hilgendorf raised, addressed, and resolved the problem concerning Mr. Kapsimalis. Kowalski stated that he would have terminated Mr. Kapsimalis on such a request by Hilgendorf. WTVO therefore retained Mr. Kapsimalis because of Hilgendorf's recommendation.

The NLRB argues that these instances are evidence only of Hilgendorf's participation in the hiring process, not of his role as a supervisor. The NLRB correctly points out that the final decisions were made not by Hilgendorf but by Kowalski. It is true that Kowalski made his own assessments and the ultimate decisions, but neither of these facts contradicts or is inconsistent with the clear evidence that Kowalski made these decisions based mainly upon Hilgendorf's recommendations. *See Joe B. Foods*, 953 F.2d at 298 (finding that dispositive recommendations on employee hiring is an indicia of supervisory status).

■ It seems to us that the NLRB's argument proves too much. It transforms the effective recommendation requirement of § 152(11) into a requirement that the supervisor reach and execute hiring decisions himself. Having authority to effectively advise such action to those senior to him in the business organization would not suffice. This would exclude from supervisor classification all but the most senior managerial personnel, for more often than not persons higher up the chain of command sign on the dotted line and execute decisions effectively made by those below. The test of a supervisor under § 152(11) is whether his judgment was dispositive in personnel decisions. The record demonstrates that Hilgendorf's judgment was the basis of the personnel decisions described above.

The NLRB's second counterpoint is the evidence that Kowalski hired a production assistant over Hilgendorf's contrary recommendation. Kowalski testified that he "took in" Hilgendorf's recommendation but exercised his judgment contrary to Hilgendorf's suggestion because he had knowledge that Hilgendorf lacked concerning the potential employee. While it is clear that Kowalski acted on his own opinion, which differed with Hilgendorf's, this example does not carry much water for the NLRB. Such action is commonplace in the hierarchial decision-making scheme of modern business organizations. Kowalski elaborated on the reasons for his decision, and he made it clear that this was a case where he had better information than Hilgendorf. The buck has to stop somewhere. To require that a supervisor's opinion always be regarded as scripture by those senior to him within the business organization would turn common sense on its head. Just as an isolated incident does not demonstrate a continuing pattern of supervisory authority, *United Broadcasting Co.*, 223 N.L.R.B. 908, 1976 WL 6884 (1976), Kowalski's decision to act contrary to Hilgendorf's recommendation in one case does not dilute the significance of Hilgendorf's role in personnel decisions.

■ Of the criteria listed in § 152(11), the power to effectively hire and fire carries the most weight. *C & W Super Markets, Inc. v. NLRB*, 581 F.2d 618, 622 (7th Cir. 1978). It is apparent from the record that there is not a substantial basis for any conclusion other than that Hilgendorf exercises

a quantum of authority in hiring decisions that qualifies him as a supervisor under § 152(11).

### D

In addition to the evidence described above, the record details Hilgendorf's role as the director of the weekday evening newscasts and the attendant need for him to exercise independent judgment. The record shows that he devises the employee work schedule so as to accommodate both WTVO's manpower needs and the employees' wishes for holidays and other leave time. The record also demonstrates that Hilgendorf harnesses his unique knowledge of the employees' capabilities in assigning tasks and areas of responsibility. In sum and substance, Hilgendorf exercises a considerable amount of independent judgment in determining the most efficient operation and organization of the WTVO weekday evening newscasts—a role that requires him to responsibly direct other WTVO employees and that qualifies him as a supervisor under the plain meaning of § 152(11).

This conclusion is buttressed by the public policy concerns animating the design of § 152. This court has recognized that the supervisor exception promotes the clearly defined chain of command that is a hallmark of modern business organizations. *Children's Habilitation Ctr.*, 887 F.2d at 132. Supervisors occupy a unique position in that chain because they often work beside the employees they are charged with directing. The structure of § 152 ensures that employers may rely on supervisors to exercise their independent judgment without the threat of accountability to the employees whom they supervise.

The record demonstrates that Hilgendorf regularly works closely with WTVO employees during his direction of the weekday evening newscasts. The balance of power between WTVO and the Union would be seriously undermined by the conflicting interests that would obtain if Hilgendorf were simultaneously beholden to WTVO as his employer and the Union that represents the employees under his charge.

### V

WTVO has also argued on appeal that the ARD wrongly created a "balkanized unit" by excluding a host of nonsupervisory WTVO employees. This case is before us on a petition by the NLRB to enforce its order to WTVO to bargain with the Union on the basis of the certified election results. We have explained that there is no substantial basis for classifying Hilgendorf as an employee, and not as a supervisor, under § 152. In addition, the NLRB has not yet made a final determination as to the placement of Mais, presumably because her vote would not have changed the outcome of the election given Hilgendorf's placement in the unit. With our decision today, the NLRB is now in a position to reach the Mais question. If she is found to be part of the bargaining unit, then the election result could be different and the NLRB might have no occasion to order WTVO to bargain with the Union. Accordingly, the questions presented in WTVO's final argument are not ripe for our review.

The petition for enforcement is DENIED and this matter is REMANDED to the National Labor Relations Board for further proceedings.