98 F.3d 993
 153 L.R.R.M. (BNA) 2649, 65 USLW 2335,
132 Lab.Cas. P 11,683
 UNIROYAL TECHNOLOGY CORPORATION, ROYALITE DIVISION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
United Paperworkers International Union, AFL-CIO, CLC,
Intervening-Respondent.
 Nos. 96-1301, 95-3958.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 4, 1996.
Decided Oct. 24, 1996.
 
 Cary Schwimmer, Jay W. Kiesewetter (argued), Kiesewetter, Wise, Kaplan, Schwimmer & Prather, Memphis, TN, for Uniroyal Technology Corporation, Royalite Division.
 Christopher W. Young (argued), National Labor Relations Board, Contempt Litigation Branch, Washington, DC, Aileen A. Armstrong, Frederick C. Havard, National Labor Relations Board, Enforcement Litigation Branch, Washington, DC, Alan L. Zmija, National Labor Relations Board, Indianapolis, IN, for National Labor Relations Board in No. 95-3958.
 Christopher W. Young (argued), National Labor Relations Board, Contempt Litigation Branch, Washington, DC, Aileen A. Armstrong, Frederick C. Havard, National Labor Relations Board, Enforcement Litigation Branch, Washington, DC, Saudria Bordone, National Labor Relations Board, Indianapolis, IN, for National Labor Relations Board in No. 96-1301.
 William R. Groth, Fillenwarth, Dennerline, Groth & Towe, Indianapolis, IN, for United Paperworkers International Union.
 Before RIPPLE, DIANE P. WOOD and EVANS, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 The production and maintenance employees at the Uniroyal Technology Corporation ("Uniroyal") plant in Warsaw, Indiana, in an election held on February 10, 1995, voted to have the United Paperworkers International Union ("Union") represent them as their exclusive bargaining representative. Uniroyal challenged the election. It alleged that the employees were denied a free choice because the Union had engaged in impermissible conduct by improperly injecting religious issues into the campaign and by materially misrepresenting other important campaign issues. The National Labor Relations Board ("NLRB" or "Board"), on July 20, 1995, adopted the hearing officer's recommendations, overruled Uniroyal's objections, and certified the election. Following the Board's certification, Uniroyal refused to bargain with the Union. The Board then determined that the employer's refusal to bargain was an unfair labor practice and ordered Uniroyal to bargain in good faith with the Union. Uniroyal now petitions for review of the NLRB order; the Board cross-applies for enforcement of its order. Because the Board's finding of an unfair labor practice is supported by substantial evidence in the record, considered as a whole, we enforce the Board's order and deny Uniroyal's cross-petition.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 Uniroyal's plant in Warsaw, Indiana manufactures sheet plastic that is eventually used in products such as attache cases and medical equipment. The facility employs approximately 130 hourly employees and 40 salaried employees. In early December 1994, the Union began an attempt to organize the production and maintenance workers at the plant and held several organizational meetings for employees interested in helping to organize the facility. Alfredo "Al" Lozano, an extruder operator on the midnight shift at the plant, attended one of the organizational meetings and volunteered to become a member of the Union's in-plant organizing committee.[1]
 
 
 4
 Beginning in the early part of December, Mr. Lozano attempted to get other employees to sign union authorization cards and answered questions about the Union. At some point in early December, Mr. Lozano approached a fellow extruder operator and friend, Tim Ellis, and sought to get him to sign a union authorization card. Mr. Ellis, who worked next to Mr. Lozano on the midnight shift, indicated that he was unsure whether he was interested in signing the card. Mr. Lozano retorted that unless he, Mr. Ellis, were to stand up against the company and support the Union, he would be the same kind of person who would end up taking the "Mark of the Beast" in the last days--the days leading up to judgment day. Mr. Ellis testified that this comment hurt his feelings. The following day, Mr. Lozano apologized to Mr. Ellis for the comment he had made.
 
 
 5
 On December 22, 1994, the Union filed a petition with the NLRB seeking to represent the maintenance and production employees at the Warsaw plant. On February 10, 1995, the Board conducted an election by secret ballot at the facility, resulting in 62 of the valid 122 votes in favor of the Union and 60 in favor of the employer. Uniroyal challenged the results of the election. It alleged that the employees had been intimidated in the exercise of their Section 7 rights[2] by the Union's use of impermissible religious appeals and threats and by the Union's material misrepresentations during the course of the campaign. The employer alleged that the conversation between Mr. Lozano and Mr. Ellis took place after the petition had been filed and that the "Mark of the Beast" comment circulated among the employees throughout the campaign, infecting the conditions necessary for a fair representation election. Uniroyal also complained that the Union built upon the "Mark of the Beast" comment and further injected religion into the campaign in two of its campaign newsletters. In one of these newsletters, an article entitled "Man of God offers advice" recounts the advice a Protestant clergyman gave to a group of young men trying to decide whether to join a union. The other newsletter refers to Uniroyal's outside legal counsel as the "devil's number one draft pick." These newsletters were distributed several weeks before the election--more than a month after the Lozano/Ellis conversation occurred. Finally, Uniroyal also challenged the election on the basis of several union misrepresentations regarding the company dental, vision and pension plans. In each case, the Union corrected these mischaracterizations.
 
 B. Decision of the Board
 
 6
 A hearing officer of the Board conducted a two-day hearing during which the employer's objections to the election were considered. The hearing officer heard testimony from sixteen witnesses. On May 12, 1995, he issued his Report on Objections to the Election with Findings of Fact and Recommendations, which the Board adopted. The NLRB certified the Union as the exclusive bargaining agent on July 20, 1995.
 
 
 7
 In evaluating the election atmosphere, the NLRB determined that the critical time period was between December 22, 1994, the day the election petition was filed, and February 10, 1995, the day of the election. See Ideal Elec. & Mfg. Co., 134 NLRB 1275, 1278 (1961). The Board found that the alleged conversation between Mr. Lozano and Mr. Ellis did occur, as Mr. Ellis testified, and that it occurred in early December--several weeks before the Union's election petition was filed. The Board also found that Mr. Lozano apologized to Mr. Ellis the following day and that the apology appeased Mr. Ellis.[3] The Board concluded that Mr. Lozano was not an agent of the Union and that the Union's two allegedly religious comments were unrelated to Mr. Lozano's comment. The Board further determined that, with respect to any circulation of Mr. Lozano's comment among the employees during the critical time period, the comment was nothing more than a matter of casual conversation. Finally, the Board also found that the Union had corrected all the misrepresentations it had made. Moreover, the NLRB, relying on Midland Nat'l Life Ins. Co., 263 NLRB 127, 133 (1982), held that the falsity of the campaign statements was not a basis for setting aside the election.[4] In short, the Board decided that none of this pre-petition or campaign conduct was sufficiently objectionable to set aside the election.
 
 
 8
 After the Board certified the Union, Uniroyal continued to refuse to bargain. On September 25, 1995, the Union filed a complaint against Uniroyal, alleging the commission of an unfair labor practice by refusing to bargain with the certified Union. See National Labor Relations Act (the "NLRA" or "Act"), 29 U.S.C. § 158(a)(1), (5). The General Counsel, on October 6, 1995, issued a complaint. The Board issued an order transferring the proceeding to itself. The NLRB found that the company had not offered any new evidence that would require it to reexamine its representation decision. The Board, therefore, granted the General Counsel's motion for summary judgment and ordered the employer to cease and desist from its unfair labor practices, to bargain with the Union in good faith and to embody any agreement reached in a writing. Uniroyal petitioned for review of this order, and the Board cross-applied to this court to enforce the order.
 
 II
 DISCUSSION
 A. Standard of Review
 
 9
 We have jurisdiction to review applications for enforcement and petitions for review of Board decisions pursuant to Sections 10(e) and (f) of the NLRA, 29 U.S.C. §§ 160(e) and (f).[5] In conducting our review, "we are reminded that '[t]he results of a Board-supervised and certified election are presumptively valid' "[6] and that our review of the Board's decision to certify a union election is extremely limited.[7] Thus, our standard of review is quite deferential: We are obligated to affirm the NLRB's findings of fact and its applications of law to fact if they are "supported by substantial evidence on the record considered as a whole." NLRB v. Winnebago Television Corp., 75 F.3d 1208, 1212 (7th Cir.1996) (citation and quotations omitted). Substantial evidence in this context is " 'such relevant evidence as a reasonable mind might accept as adequate to support the Board's conclusion.' "[8] We shall uphold the Board's legal conclusions that have a "reasonable basis in law."[9] This deferential standard of review is appropriate in light of Congress' intent to confer upon the Board broad authority to develop national labor policy.[10]
 
 B. Injection of Religion into Campaign
 
 10
 Uniroyal challenges the Board's determination that the religious comments made before and during the campaign did not make the election unfair. The Board found, as a factual matter, that Mr. Lozano's comment to Mr. Ellis was made in early December, several weeks before the petition for an election was even filed, and that the comment was made only in Mr. Ellis' presence. It also found that Mr. Lozano apologized to Mr. Ellis the very next day. The Board noted that Mr. Ellis, rather than being intimidated by the comment and voting for the Union, became an ardent opponent of the Union and even, on occasion, wore a "vote no" anti-union button. The NLRB further determined that Mr. Lozano was not an agent of the Union when making his "Mark of the Beast" comment and that the two other instances in which the Union allegedly injected impermissible religious issues into the campaign were unrelated to Mr. Lozano's comment. Uniroyal challenges each of these factual findings.
 
 
 11
 In challenging the Board's determinations, the employer faces a heavy burden. A Board-run representation election is presumptively valid and the burden is on the objecting party to prove the election invalid.[11] Here, Uniroyal, as the objecting party, must demonstrate that there is no substantial evidence in the record for the Board's findings and evaluation that the alleged objectionable conduct did not create an atmosphere of fear and reprisal so that the rational, uncoerced selection of a bargaining representative was rendered impossible. See Tuf-Flex Glass v. NLRB, 715 F.2d 291, 296 (7th Cir.1983).
 
 1.
 
 12
 We find adequate support in the record to uphold the Board's determination that Mr. Lozano's comment occurred in the pre-petition period--sometime in early December. A number of witnesses at the hearing testified as to the timing of the comment. Those witnesses placed the comment as being made as early as the first part of December to as late as the latter part of January. Mr. Lozano testified that, although he did not make the "Mark of the Beast" comment at all, he did discuss the Union with Mr. Ellis and tried to solicit Mr. Ellis' signature for a union authorization card. According to Mr. Lozano, this conversation occurred in the beginning of December. Mr. Ellis testified that the incident with Mr. Lozano occurred before the petition was filed, in "early December or ... later December." Tr. at 93. Other employees testified that, although they did not hear or participate in the conversation, to their knowledge, Mr. Lozano made his remark to Mr. Ellis later.[12] From this widely varying testimony, the Board decided to rely upon the testimony of the two individuals most intimately involved in the incident, Mr. Ellis and Mr. Lozano, to determine the timing of their conversation. This determination finds substantial support in the record considered as a whole.
 
 
 13
 We also believe that the record amply supports the Board's finding that Mr. Lozano apologized to Mr. Ellis the next day. Mr. Ellis testified that Mr. Lozano had apologized to him the very next day.[13] Also, Ms. Marshall testified that Mr. Ellis told her that Mr. Lozano had come up to him and apologized several days after Mr. Lozano made the remark.
 
 2.
 
 14
 The Board found that there was no evidence in the record that the Union had given Mr. Lozano the actual authority or that he had apparent authority to speak on behalf of the Union. Therefore, the Board reasoned, he was not an agent of the Union, and his "Mark of the Beast" statement could not be attributed to the Union. Although we have not always set out the clearest standards in our approach to the agency question in the Union election context,[14] we noted in NLRB v. Service American Corp., 841 F.2d 191 (7th Cir.1988), that a number of other circuits have followed, and the NLRA supports, a liberal approach in construing agency in this context.[15] Even following this more liberal approach in attributing the acts of employees to the Union, the record supports the NLRB's decision that Mr. Lozano was not acting as an agent of the Union. Mr. Lozano was not paid by the Union for any of his activities in support of the Union. The record discloses that Ted Sautter, the professional International Organizer, exclusively ran the Union campaign. Mr. Sautter testified that he was the only full-time employee of the Union and that he alone put together and issued the campaign literature, relying largely on materials sent to him by the Union. Mr. Sautter also distributed the educational materials given to the volunteers on the in-plant organization committee at the early organizational meetings and to other employees who asked for the information.[16] Although Mr. Lozano was a member of the in-plant organizing committee, the record does not disclose that he had substantial union responsibilities.[17] Nor does it indicate that the Union had manifested an intent to have Mr. Lozano generally speak or act on behalf of the Union or that other employees thought that he was vested with such authority.[18]
 
 
 15
 The question of whether an employee is an agent of the Union is a "very fact-specific issue." Kux Mfg. Co. v. NLRB, 890 F.2d 804, 809 (6th Cir.1989). The distinction between an employee-union supporter and employee-union agent is "a fine one." NLRB v. Herbert Halperin Distrib. Corp., 826 F.2d 287, 290 (4th Cir.1987). Deference to the NLRB's expertise in labor relations is especially appropriate in such situations. Here, the record amply supports the NLRB's factual determination that Mr. Lozano was not an agent of the Union.[19]
 
 3.
 
 16
 The Board determined that there was no connection between the Union's two instances of alleged injection of religion into the campaign and Mr. Lozano's comment. Uniroyal argues that the Union built upon, and thereby adopted, Mr. Lozano's inflammatory religious comment. The Board, however, found that the timing of the comments did not support the employer's contention that the Union was trying to capitalize on Mr. Lozano's statement. The Union's two newsletters, containing the allegedly religious remarks, were issued a month after Mr. Lozano made the comment to Mr. Ellis. Mr. Sautter testified that the items that appeared in the union newsletters were in no manner intended to build upon Mr. Lozano's pre-petition conduct.[20] He further testified that the "Man of God offers advice" story came to him from the International Union. In addition, Uniroyal has failed to carry its burden in demonstrating that there is a connection between Mr. Lozano's "Mark of the Beast" comment and the newsletter story, "Man of God offers advice," which describes an incident in which a Protestant clergyman discussed the economic advantages of unionizing with some young men from his community. Likewise, Uniroyal has not shown the connection between either of these two comments and the newsletter story that refers to the company's outside labor counsel as the devil's number one draft pick.[21] Thus, the record, considered as a whole, supports the Board's factual finding that the Union did not capitalize on Mr. Lozano's religious comment.
 
 4.
 
 17
 The Board, after a two-day hearing, evaluated the effect of Mr. Lozano's pre-petition comment and the Union's two pre-election religious statements made several weeks before the election on the campaign atmosphere. The NLRB determined that Mr. Lozano's conduct, which was unrelated to the Union's conduct, did not so pollute the campaign atmosphere that the election need be set aside. Uniroyal nevertheless argues that Mr. Lozano's comment was made during the critical time period, or at least circulated among the employees during the critical time, and caused quite a furor. The employer further contends that this comment, although perhaps not attributable to the Union, when coupled with the Union's statements, created such an atmosphere of fear and confusion that a free and fair election was impossible.[22]
 
 
 18
 "Traditionally, the Board and reviewing courts have been more reluctant to set aside an election because of misconduct by third parties, as compared with agents of the parties." Service American Corp., 841 F.2d at 195. This distinction recognizes both the difficulty that parties have in controlling third-party conduct and the burden of having to rerun elections.[23] Evaluating whether the alleged conduct in fact has made the employees' free and fair choice for a bargaining agent impossible is a decision for the Board and is one to which we give substantial deference.[24] Here, the Board determined that the election process was not impermissibly sullied by the single comment made by Mr. Lozano to one other employee several weeks before the Union filed the petition or by the unrelated statements in the Union newsletters. This decision is consistent with Board policy. The NLRB, in several cases, has held that instances in which employee-members of the in-house organizing committee making prejudicial or inflammatory remarks during the election do not constitute a basis for setting aside the election.[25] The Board's determination here that even less weight should be given to such comments before the petition is even filed is well-founded. In this case, the alleged inflammatory comment was made several weeks before the election, and the target of the alleged threat, Mr. Ellis, did not thereafter support the Union; instead, he demonstrated an anti-union attitude, including, on occasion, wearing a "vote no" button.
 
 
 19
 The employer asserts that, even if Mr. Lozano made his remark to Mr. Ellis during the pre-petition period, the comment circulated among the plant's employees and caused such a stir that it created an atmosphere of fear and misunderstanding in which free choice in selecting a bargaining agent was impossible.[26] Although several witnesses testified that the Lozano/Ellis incident was recounted on several occasions during the campaign, there is evidence in the record supporting the conclusion that the electorate was not intimidated by the alleged threat.[27] Cf. NLRB v. Lovejoy Indus., 904 F.2d 397, 402 (7th Cir.1990) ("The statute does not require the Board to treat employees as if they were bacteria on a petri dish that must be kept free of contamination."). Considered as a whole, the record substantially supports the Board's view that the making and dissemination of the remark during the pre-election campaign did not so taint the process that a new election is required.[28]
 
 C. Material Misstatements
 
 20
 Lastly, we find that the record amply supports the Board's refusal to set aside the election results based upon alleged union misstatements made during the campaign with respect to the pension, vision and dental plans. Uniroyal complains of two statements by the Union. On one occasion, Mr. Sautter, the professional union organizer, informed employees in the December 22 newsletter that they had lost their vision and dental plans, while the employees at another of Uniroyal's plants, represented by the Union, had retained these benefits. This statement apparently was untrue. The Board credited Mr. Sautter's testimony that he had corrected this misstatement, and that both Uniroyal and Mr. Sautter subsequently told employees that the other plant's employees had similarly lost their dental and vision benefits. In the same newsletter, Mr. Sautter published an article that indicated that, although Uniroyal's Warsaw, Indiana employees had lost some of their pension funds, the Uniroyal plant where the Union represented the employees had retained them. Again, Mr. Sautter informed the employees that he had been mistaken.
 
 
 21
 The Board currently reviews whether misstatements warrant setting aside a Board-conducted election under the Midland standard. Midland Nat'l Ins. Co., 263 NLRB 127 (1982). Under this standard, the Board:
 
 
 22
 will no longer probe into the truth or falsity of the parties' campaign statements, and ... will not set elections aside on the basis of misleading campaign statements. [The Board] will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is. Thus [the Board] will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is.
 
 
 23
 Midland, 263 NLRB at 133. We have, on occasion, left unanswered the question of whether we agree with the Board that only forged documents would warrant setting aside an election--intimating that there may be other circumstances in which the deceptive manner used by a party would likewise render employees unable to evaluate the campaign propaganda for what it is.[29] We need not answer this question today. For wherever the outer boundaries of the Midland standard lie, the Union's conduct is not in their vicinity. Here, the misrepresentations were made in a union newsletter during the campaign and were clearly attributable to the Union, an interested, identifiable party. Uniroyal complains of only three misrepresentations that were made, and the Union informed the electorate that the Union was mistaken in each case. This situation seems to fall squarely in the heartland of the Midland doctrine--statements regarding a campaign issue that voters could easily recognize as propaganda. Consequently, the Board's refusal to set aside the election was supported by the record.
 
 III
 CONCLUSION
 
 24
 Because the Board's factual determinations are substantially supported by the record, considered as a whole, and its legal conclusions have a reasonable basis in law, the Board's order is enforced and Uniroyal's petition for review of the order is denied.
 
 
 25
 ENFORCEMENT GRANTED; REVIEW DENIED.
 
 
 
 [1]
 As a member of the in-plant organizing committee, Mr. Lozano was given some educational pamphlets about the Union. These materials were given to all who volunteered to serve on the committee and to any other employee who asked for them. Mr. Lozano received no compensation from the Union
 
 
 [2]
 Section 7 of the NLRA, in relevant part, provides:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities....
 29 U.S.C. § 157.
 
 
 [3]
 The Board found that Kathy Larkin credibly testified that, sometime before Christmas, she had a conversation with Mr. Ellis in which he recounted the Lozano incident. At that time, Ms. Larkin testified, Mr. Ellis had described the incident as "funny."
 
 
 [4]
 Under the Midland standard, the Board will not set aside an election "because of the substance of a representation, but [will do so] because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is." Midland, 263 NLRB at 133; see infra
 
 
 [5]
 Section 10(e) provides, in relevant part: "The Board shall have the power to petition any court of appeals of the United States ... wherein the unfair labor practice in question occurred ... for enforcement of such order." 29 U.S.C. § 160(e)
 Section 10(f) provides, in relevant part:
 Any person aggrieved by a final order of the Board ... may obtain review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia Circuit.
 Id. § 160(f).
 
 
 [6]
 K-Mart Corp. v. NLRB, 62 F.3d 209, 212 (7th Cir.1995) (quoting Tempco Elec. Heater Corp. v. NLRB, 999 F.2d 1109, 1111 (7th Cir.1993))
 
 
 [7]
 NLRB v. Chicago Tribune Co., 943 F.2d 791, 794 (7th Cir.1991) (citing Van Leer Containers, Inc. v. NLRB, 841 F.2d 779, 784 (7th Cir.1988)), cert. denied, 504 U.S. 955, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992)
 
 
 [8]
 Carry Cos. v. NLRB, 30 F.3d 922, 926 (7th Cir.1994) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951))
 
 
 [9]
 America's Best Quality Coatings Corp. v. NLRB, 44 F.3d 516, 520 (7th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995); see NLRB v. Augusta Bakery Corp., 957 F.2d 1467, 1471 (7th Cir.1992) (noting that court is bound to "uphold the legal conclusions of the Board unless they are irrational or inconsistent with the [NLRA]")
 
 
 [10]
 America's Best Quality Coatings, 44 F.3d at 520; see NLRB v. WFMT, 997 F.2d 269, 274 (7th Cir.1993) ("We must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life."); International Ass'n of Bridge, Structural, & Ornamental Ironworkers, AFL-CIO v. NLRB, 946 F.2d 1264, 1267 (7th Cir.1991) ("Our standard of review is deferential in recognition of Congress' delegation to the NLRB of primary responsibility for national labor policy.")
 
 
 [11]
 NLRB v. WFMT, 997 F.2d at 274 (citing NLRB v. Mattison Mach. Works, 365 U.S. 123, 124, 81 S.Ct. 434, 435, 5 L.Ed.2d 455 (1961))
 
 
 [12]
 Mr. Boyer, a production foreman, testified that Mr. Ellis reported the incident to him a few days before Christmas shutdown, which, according to Mr. Boyer's recollection, would have probably been on or about the twenty-first or twenty-second of December. Another employee, Ms. Geneva Marshall, testified that Mr. Ellis had mentioned the incident to her a couple of days after it had occurred, sometime in mid to late January
 
 
 [13]
 Mr. Ellis testified that he did not think that it was a sufficient or proper apology, but that Mr. Lozano did apologize
 
 
 [14]
 See NLRB v. Service American Corp., 841 F.2d 191, 196 (7th Cir.1988) (noting the Seventh Circuit's apparent inconsistency in determining agency in the union election context by comparing the approach taken in NLRB v. Katz, 701 F.2d 703 (7th Cir.1983) (rules of agency are liberally construed in the union election context) with Tuf-Flex Glass v. NLRB, 715 F.2d 291, 296 (7th Cir.1983) (test for agency in union election context is stringent))
 
 
 [15]
 See id. (noting the approach taken--agency is to be construed liberally--by the Third, Fourth, Fifth and Ninth Circuits). The Act provides that "[i]n determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question whether specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13)
 
 
 [16]
 Cf. NLRB v. Herbert Halperin Distrib. Corp., 826 F.2d 287, 290-91 (4th Cir.1987) (upholding Board's determination that employees were not agents of the Union in instance in which professional union staff was heavily involved in the campaign); S. Lichtenberg & Co., 296 NLRB 1302, 1314-15 (1989) (noting that in-house organizing committee members were not agents of the Union in instance in which members of the committee were not the Union's sole link to employees and in which professional staff personally and actively directed the Union's campaign effort)
 
 
 [17]
 Cf. Kux Mfg. Co. v. NLRB, 890 F.2d 804, 809 (6th Cir.1989) (upholding Board's determination that members of In-Plant Organizing Committee had so few responsibilities and such limited authority that they could not be mistaken for union agents)
 
 
 [18]
 Cf. Advance Prods. Corp. v. District No. 121, Int'l Ass'n of Machinists & Aerospace Workers, 304 NLRB 436, 1991 WL 172390 (1991) (finding member of In House Organizing Committee who was not held out by the Union as its agent was not a general agent of the Union in instance in which three paid union organizers actively conducted the campaign)
 
 
 [19]
 Uniroyal contends that this conclusion is inconsistent with our decisions in NLRB v. Service American Corp., 841 F.2d at 196 and St. Elizabeth Hospital v. NLRB, 715 F.2d 1193 (7th Cir.1983). However, in each of those cases, the Board had not held a hearing on the issue of an employee's agency. In Service American Corp., we did not determine that the employee similarly situated to Mr. Lozano was an agent of the union; rather, we determined that the Board should have held a hearing on the issue. Similarly, St. Elizabeth Hospital is not helpful to the petitioner. There, we determined that given the disparity of the parties' description of the conversations at issue and the dearth of any facts to buttress the Board's conclusion that the employee was not an agent of the union or that the employee's comments had no effect on the outcome of the election, the Board would need to hold an evidentiary hearing on these issues. St. Elizabeth Hosp., 715 F.2d at 1199. Unlike in Service American Corp. or St. Elizabeth Hospital, in this case, the Board did hold an evidentiary hearing on the agency issue and found that Lozano was not an agent of the union and that his actions were not properly attributable to it. This determination finds substantial support in the record
 
 
 [20]
 The hearing officer, who observed Mr. Sautter testify, is in the best position to determine the credibility of the witness. We have frequently noted that we will not overturn the credibility finding of a hearing officer, except in the most extraordinary circumstances. See Carry Cos. v. NLRB, 30 F.3d 922, 926 (7th Cir.1994) (citing cases); Stripco Sales, Inc. v. NLRB, 934 F.2d 123, 125 (7th Cir.1991)
 
 
 [21]
 Mr. Sautter testified that he heard this phrase in reference to an individual football player and thought that it sounded like a good expression
 
 
 [22]
 Uniroyal argues that applicable case law undermines the Board's determination that the comment made by Mr. Lozano, who was not an agent of the Union, was sufficient to taint the whole campaign process. We do not believe that NLRB v. Katz, 701 F.2d 703 (7th Cir.1983), NLRB v. Silverman's Men's Wear, 656 F.2d 53 (3d Cir.1981), or Sewell Mfg. Co., 138 NLRB 66 (1962), are contrary to the Board's findings here. In both Katz and Silverman's, the courts of appeals refused to enforce the Board's orders in instances in which, despite company affidavits of multiple racial or ethnic slurs, the Board had not conducted a hearing on whether the comments made employees' exercise of their Section 7 rights impossible. See Katz, 701 F.2d at 704-06; Silverman's, 656 F.2d at 55. In each instance, the court stated that the evidence presented was sufficient to entitle the employer to a hearing on its objections to the union's certification. In the case at bar, the employer was given the hearing that Katz and Silverman's Men's Wear were denied. Further, the alleged conduct that occurred in both those cases occurred during the election campaign
 Those cases are further distinguishable. In Silverman's, the ethnic comments of which the company complained were made by a representative of the union, the Union Secretary-Treasurer. As we discuss, see infra, we do not find objectionable the Board's policy of holding the parties to a higher standard of conduct than third parties. In Katz, we required the Board to hold a hearing on the issue of whether a free and fair election was possible because the company had alleged that employees, who were not agents of the union, had made a number of ethnic and racial slurs throughout the campaign process. There, however, in addition to the alleged ethnic slurs, we relied upon the allegations of threats of violence and retaliation in denying enforcement of the Board's order. See Katz, 701 F.2d at 708 ("On these facts alone [no hearing on allegations of ethnic slurs held] we would be inclined to hold that the Board's petition for enforcement must be denied. We need not rest solely on this ground, however, because other serious allegations of misconduct [threats of violence and retaliation] exist in the instant case.") (emphasis added).
 Finally, reliance on the Sewell doctrine is similarly not availing to Uniroyal. As the NLRB explained in Beatrice Grocery Prods., 287 NLRB 302 (1987):
 In Sewell Mfg. Co., 138 NLRB 66 (1962), the Board held that it would set aside elections when a party embarks on a campaign which seeks to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals. Sewell itself involved a party's sustained course of conduct, deliberate and calculated in intensity, to appeal to racial prejudice. The Board in Sewell distinguished such conduct from isolated, casual, prejudicial remarks.
 Id. at 302 (citations omitted) (emphasis added). We believe that the record amply supports the Board's conclusion that Mr. Lozano's remark is of the latter type, rather than the former. In addition, as noted earlier, Mr. Lozano was a third party.
 
 
 [23]
 See Stripco Sales, 934 F.2d at 127 (noting that neither unions nor employers can prevent the misdeeds of third-parties); NLRB v. Precise Castings, Inc., 915 F.2d 1160, 1164 (7th Cir.1990) ("Rerunning elections, or litigating about their validity, may frustrate indefinitely the implementation of the employees' legitimate selection."); NLRB v. Lovejoy Indus., 904 F.2d 397, 402 (7th Cir.1990) ("The Board may rationally conclude that employees' votes are less likely to be swayed by the isolated bluster and misconduct by adherents [of the union] than by a policy of intimidation carried out by the union itself.")
 
 
 [24]
 See Precise Castings, Inc., 915 F.2d at 1164 ("Choosing how much imperfection to accept is for the Board [to decide].")
 
 
 [25]
 See Catherine's, Inc., 316 NLRB 186, 189 (1995); Advance Prods. Corp., 304 NLRB 436 (1991); Benjamin Coal Co., 294 NLRB 572 (1989)
 
 
 [26]
 Uniroyal argues that the Board erred by failing to give greater weight to the "hyper-religious atmosphere" of the Warsaw plant. We note that the evidence on the issue was presented to and evaluated by the Board. As we discuss, supra, the evaluation of a campaign and election atmosphere is a decision for the NLRB. We find that its decision on the atmosphere of the campaign is adequately supported by the record
 
 
 [27]
 Ms. Larkin, for example, testified that when Mr. Ellis relayed the story to her, he said "I laughed [at the comment] 'cause I thought it was funny. I didn't even understand exactly what it meant. But I just kind of looked at him [Mr. Lozano] and found something else to do." Tr. at 406. Ms. Larkin further testified that she told the story, in an "off the cuff" manner, to another employee, Ms. Judy Hunsberger, and repeated to Ms. Hunsberger that Mr. Ellis had found the incident "funny." Id. at 407. Ms. Hunsberger testified that she had not remembered any other references to religion throughout the campaign. Ms. Jean Grey, the company's industrial nurse, testified that some people mentioned Mr. Lozano's comment to her; some thought it was quite funny and would make funny comments about it, but others were upset by it. Finally, Mr. Ellis testified that, although the comment upset him, he did not want to discuss the matter with Mr. Lozano when Mr. Lozano apologized to him because he "just wanted to let it go." Tr. at 100
 
 
 [28]
 We do not find Mr. Lozano's comment in the pre-petition period or its circulation during the campaign similar to the case cited in petitioner's brief to support its dissemination theory. In Lovilia Coal Co., 275 NLRB 1358 (1985), the Board dealt with the repetition of rumors that if the Union did not win, the mine would be blown up. The Board found that the rumors were serious and were circulated throughout the campaign. 275 NLRB at 1358-59. The Board set aside the election because, in its judgment, the conduct interfered with employee free choice. The procedural posture of that case distinguishes it from the case at bar. In Lovilia Coal, the NLRB evaluated the election atmosphere and made a factual finding that the dissemination of the threats to blow up the mine if the Union did not win contaminated the election atmosphere. Here, Uniroyal asks us to replace the Board's evaluation of the election atmosphere with our own. This we decline to do. See NLRB v. Winnebago, 75 F.3d 1208, 1212 (7th Cir.1996). We review deferentially the Board's determination of whether an election was conducted in a free and fair manner. Id
 
 
 [29]
 See NLRB v. Affiliated Midwest Hosp., 789 F.2d 524, 528-29 & n. 3 (7th Cir.1986) (noting the Sixth Circuit's creation of an exception to the Midland standard in instances in which misrepresentations are so pervasive and deceptive that employees cannot separate the truth from falsehoods; declining to reach the issue of whether the Seventh Circuit would create such an exception); NLRB v. Chicago Marine Containers, 745 F.2d 493, 498-500 (7th Cir.1984) (noting that there may be situations in which it might be inappropriate to be strictly bound by the Midland standard). The Sixth Circuit has adopted such an exception. See NLRB v. Hub Plastics, 52 F.3d 608, 612 (6th Cir.1995) (quoting Van Dorn Plastic Mach. Co. v. NLRB, 736 F.2d 343 (6th Cir.) (" 'There may be cases where no forgery can be proved but where the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to free and fair choice will be affected.' "), cert. denied, 469 U.S. 1208, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985))